MICHAEL RAY ROBLES
**NAME**

C.D.C.# V-69864
**PRISON IDENTIFICATION / BOOKING NUMBER**

P.O. BOX 5246    CSATF-S.P.    C3-204
**ADDRESS OR PLACE OF CONFINEMENT**

Corcoran, California 93212

**NOTE:** It is your responsibility to notify the Clerk of Court in writing of any change of address. If represented by an attorney, provide his name, address and telephone number.

2254 ✓    1983
FILING FEE PAID
Yes ☐    No ✓
IFP MOTION FILED
Yes ☐    No ✓
COPIES SENT TO
Court ✓    ProSe

**FILED**

OCT 29 2007

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

---

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

MICHAEL RAY ROBLES, [V-69864],
**FULL NAME**
*(Include name under which you were convicted)*

Petitioner,

v.

DERRAL G. ADAMS, Warden,
**NAME OF WARDEN, SUPERINTENDENT, JAILOR OR AUTHORIZED PERSON HAVING CUSTODY OF PETITIONER**

Respondent.

CASE NUMBER: 07CV 2069 JAH PCL
CV- _____
To be supplied by the Clerk of the United States District Court.

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY
28 U.S.C. § 2254**

PLACE/COUNTY OF CONVICTION RIVERSIDE
PREVIOUSLY FILED, RELATED CASES IN THIS DISTRICT COURT
*(List by case number)*

CV- _____
CV- _____
CV- _____

---

(If petitioner is attacking a judgment which imposed a sentence to be served in the *future*, petitioner must fill in the name of the state where the judgment was entered. If petitioner has a sentence to be served in the *future* under a federal judgment which he wishes to attack, he should file a motion under 28 U.S.C. §2255, in the federal court which entered the judgment.)

## INSTRUCTIONS - READ CAREFULLY

This petition shall be legibly handwritten or typewritten, and signed by the petitioner, under penalty of perjury. You must set forth CONCISELY the answer to each question in the proper space on the form. Any false statement of a material fact may serve as the basis for prosecution and conviction for perjury.

You must not attach separate pages to this petition, except that ONE separate additional page is permitted in answering Question No. 10.

Upon receipt of a fee of $5.00 your petition will be filed if it is in proper order.

If you are seeking leave to proceed in forma pauperis (without paying the $5.00 filing fee and other court costs), then you must also complete and execute the declaration on the last two pages, setting forth information which establishes your inability to pay the fees and costs of the proceedings or to give security therefor. If you wish to proceed in forma pauperis, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account in the institution. If your prison account exceeds $25.00, you must pay the filing fee as required by the rule of the district court.

When the petition is completed, the original and two copies must be mailed to the Clerk of the United States District Court for the Central District of California, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012, ATTN: Intake/Docket Section.

A single petition should be used to challenge a particular State Court judgment of conviction and/or sentence.

Petitions which do not conform to these instructions will be returned with a notation as to the deficiency.

---

PLEASE COMPLETE THE FOLLOWING: *(Check appropriate number)*

This petition concerns:

1. ☒ A conviction.
2. ☒ A sentence.
3. ☐ Prison discipline.
4. ☐ A parole problem.
5. ☐ Other.

## PETITION

1. Venue
   (a) Place of detention  Corcoran State Prison, Corcoran, California 93212
   (b) Place of conviction  RIVERSIDE, CALIFORNIA
   (c) Place sentenced  Same as above (b)

2. Conviction on which the petition is based *(a separate petition must be filed for each conviction being attacked).*
   (a) Nature of offenses involved *(include all counts):*  5 Counts of attempted premeditated murder(Counts 1 thru 5); gang and gun use enhancements attached to all counts(1 thru 5).

   (b) Penal or other code section or sections: 5; §§§664/187; 186.22(b); 12022.53(d), on all 5 Counts on the information.

   (c) Case number:  RIF 111919
   (d) Date of conviction:  12/17/2004
   (e) Date of sentence:  02/04/2005
   (f) Length of sentence on each count:  Total of 200 years to Life; 5-25 years to life; 5-15 to life sentences.

   (g) Plea  *(check one)*
       ☒ Not guilty
       ☐ Guilty
       ☐ Nolo Contendere

   (h) Kind of trial:  *(check one)*
       ☒ Jury
       ☐ Judge only
       ☐ Judge alone on transcript

   (i) Did you testify at the trial?
       ☐ Yes    ☒ No

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY
28 U.S.C. § 2254

3. Did you appeal from the conviction of sentence?

   ☒ Yes   ☐ No

4. If you did appeal, give the following information for each appeal:

  (a) (1) Name of court: Court of Appeal of the State of California, Fourth Appellate District

     (2) Result: affirmed convictions and enhancements, including the consecutive sentences ( See Appendix A, attached to Petition for Review.)

     (3) Date of result: July 31, 2006

     (4) Citation or number of opinion: E 037482

     (5) Grounds raised *(list each)*:

       (a) Insufficient evidence supported conviction(attempted murder) of Garcia, Count 5, & Enhancements.

       (b) Insufficient evidence supports the true finding, that all crimes were committed for gang(Ibid.)

       (c) Imposition of consecutive terms violated appellant's federal constitutional rights( BLAKELY )Ibid.

       (d) _____

       (e) _____

       (f) _____

       (g) _____

  (b) (1) Name of court: _____

     (2) Result: _____

     _____

     (3) Date of result: _____

     (4) Citation or number of opinion: _____

     (5) Grounds raised *(list each)*:

       (a) _____

       (b) _____

       (c) _____

       (d) _____

       (e) _____

       (f) _____

       (g) _____

5. If you did not appeal:

  (a) State your reasons _____

  _____

  _____

  _____

  _____

(b) Did you seek permission to file a late appeal?
☐ Yes    ☐ No

6. Other than a direct appeal, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?

☒ Yes    ☐ No

7. If you answer to 6 was "Yes", give the following information:

(a) (1) Name of court: California Supreme Court

(2) Nature of proceeding: Petition for review ( See Appendix A, includes, opinion from the Appellate Court, Fourth District, Case No. E-037482.)

(3) Grounds raised: Same as the direct appeal.( see 4.(5) (a thru c), above.)

(4) Result: Denied Review( see order attached hereto) Without prejudice, as to Ground 3, BLAKELY Vs. WASHINGTON, only.

(5) Date of result: October 11,2006

(6) Citation or number of any written opinions or orders entered pursuant to each such disposition.
S-146360 (En Banc)

(b) (1) Name of court:

(2) Nature of proceeding:

(3) Grounds raised:

(4) Result:

(5) Date of result:

(6) Citation or number of any written opinions or orders entered pursuant to each such disposition.

(c) (1) Name of court:

(2) Nature of proceeding:

(3) Grounds raised:

(4) Result:

(5) Date of result:

(6) Citation or number of any written opinions or orders entered pursuant to each such disposition.

8. Was an evidentiary hearing held?

☐ Yes    ☒ No

If so, state the name of the court, and the result: _____

_____

_____

9. If your answer to 6 was "No", explain briefly why you did not seek post-conviction relief in the state courts.

_____

_____

_____

_____

**CAUTION:** *Exhaustion Requirement:* In order to proceed in federal court, you must ordinarily first exhaust your state court remedies as to each ground on which you request action by the federal court. This means that even if you have exhausted as to some grounds, you must first present all other grounds to the state court.

10. State concisely every ground on which you claim that you are being held unlawfully. Summarize briefly the facts supporting each ground. If necessary, attach a **SINGLE** page only behind this page.

**CAUTION:** If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date. You must state facts, not conclusions, in support of your grounds. (e.g., if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do). A rule of thumb is - who did exactly what to violate your rights at what time or place.

(a) Ground one:    Please see attached Petition; all three grounds.

_____

Supporting FACTS (tell your story BRIEFLY without citing cases or law):

_____

_____

_____

_____

_____

(b) Ground two: _____

_____

Supporting FACTS (tell your story BRIEFLY without citing cases or law):_____

_____

_____

_____

_____

_____

_____

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**
28 U.S.C. § 2254

(c) Ground three: _____

_____

Supporting FACTS (tell your story BRIEFLY without citing cases or law): _____

_____
_____
_____
_____
_____

(d) Ground four: _____

_____

Supporting FACTS (tell your story BRIEFLY without citing cases or law): _____

_____
_____
_____
_____
_____

11. If any of the grounds listed in 10 were not previously presented to this court or any other court, state briefly which grounds were not presented, and give your reasons: Ground 1; is extended to cover all 5 Counts, and not only to GARCIA (count 5), because of the erroneous Jury Instruction, Cal.Jic. 8.66.1 given to the Jury(5RT 913-914), that lighten the prosecution's burden of proof, depriving this Petitioner of his Federal Due Process of Law.(Inre Winship(1970),supra.)

12. Do you have any petition, appeal or parole matter pending in any court, either state or federal as to the judgment of conviction under attack?

☐ Yes    ☒ No

13. Are you presently represented by counsel?

☐ Yes    ☒ No

If so, provide name, address and telephone number: _____

_____
_____

Case name and court: _____

_____
_____

**WHEREFORE**, petitioner prays that the court grant petitioner relief to which he may be entitled in this proceeding.

_____
*Signature of Attorney (if any)*

I declare (or certify, verify or state) under penalty of perjury that the foregoing is true and correct.  Executed on
___October 10, 2007___
*Date*

X _____
*Signature of Petitioner*

///
see APPENDIX  A.

## PROOF OF SERVICE BY UNITED STATES MAIL
### (Code of Civil Procedure Section 1015)
### (28 U.S.C. Section 1746)

I, Michael Ray Robles , declare, depose and say, the following statement is true and correct under penalty of perjury according to the laws of the State of California based on matters known to me personally to be true:

1) I am over the age of eighteen years a resident and state prisoner, of the State of California with a present mailing address of:
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
CSATF-STATE PRISON, P.O. BOX 5246, CORCORAN, CALIFORNIA 93212
2) On this 10 day of October 200 7 , I caused a true and correct copy of the following, specifically described, document(s); to wit:

PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY
( 28 U.S.C. §2254 ), and APPENDIX  A

At the prison to be placed in a sealed envelope(s), with first class postage, having been placed thereon, duly addressed to the interested person or persons described hereinafter, and then deposited such envelope(s) in the regular United States mail, or mail service made available a where I am being detained, to the addressee(s):

Office of the Attorney General
 P.O. BOX 85266
San Diego, CAlifornia 92186-5266

3) I declare that there has been regular U.S. mail pick-up by correctional officers at the prison, and/or delivery service, at the places(s) where I posted the envelopes described above, regular communication by mail between the place of mailing and the place so addressed.

Executed this 10 day of October , 200 7 , under penalty of perjury according to the laws of the State of California, at Los Angeles, County, City of Lancaster.

X _____
                Declarant
Michael Ray Robles,
In Propria Persona

1 | MICHAEL RAY ROBLES [C.D.C.# V-69864]
CSATF- State Prison
2 | Facility  C3-204
Corcoran, California 93212

3

4 | In Propria Persona

5

6

7

8 |                    IN THE UNITED STATES DISTRICT COURT
9 |              FOR THE CENTRAL DISTRICT OF CALIFORNIA,
                            EASTERN DIVISION
10

11 | MICHAEL RAY ROBLES,                  )        CASE NO._____
                        Petitioner,[V-69864], )
12 |                                      )
    Vs:                                   )        PETITION FOR WRIT OF HABEAS CORPUS
13 |                                      )        BY A PERSON IN STATE CUSTODY ( 28
    DERRAL G. ADAMS, Warden,              )        U.S.C. § 2254.)
14 |                        Respondent.    )
                                          )
15 |_____)

16

17 |                   THE STATEMENT OF RELEVENT FACTS

18 | Prosecution's Evidence

19 |     On saturday, August 9, 2003, Amanda Moya was living with her parents and

20 | younger brother at 3176 Blossom Way in Riverside. Amanda's parents and brother

21 | had gone camping for the weekend, so Amanda decided to invite some of her friends

22 | from school over to her parent's house to "hang out". Amanda ran into her cousin,

23 | Ruben Lopez, earlier that day, and she also invited Ruben to come over to her

24 | parent's house that night. (2RT 290-293.) A neighbor and friend of the Moya

25 | family, Dawn Morgan, came over to check on Amanda sometime after 11 p.m. that

26 | evening. By that point, there were at least 60 people in their late teens and 20s

27 | crammed into the Moya's backyard, inside the house and drinking beer. (2RT 328-

28 | 330, 337-342, 352.)

1      Amanda's cousin, Ruben Lopez, invited his friends to join him at the party
2  sometime after 11 p.m. that evening, Lopez and his friends arrived at Amanda's
3  house in two separate cars. With Lopez were Albert Negrete(count 1), Gustavo Rubio
4  (count 2), Jonathan Bonilla, David Garcia(count 5), and Robert Zavala(count 4). In
5  the information, Lopez was count 3. There were no charges filed against Petitioner
6  as to Bonilla. None of these people are gang members. (1RT 71-73, 194-196; 2RT 356
7  -358, 419-423; 3RT 489-496, 550-555.) When the group arrived, they proceeded to the
8  backyard where they began to play pool and drink beer. No one drank more than 4,
9  beers, or enough to become heavely intoxicated.(1RT 74-79.)

10      Petitioner was allegedly at the party before Lopez and his friends arrived.(
11  1RT 79-84.) Petitioner was an alleged, self-admitted member of the Casablanca
12  criminal street gang. The location of the party was about half-a-mile away from the
13  area the Casablanca gang defines as its territory or turf.(3RT 641, 653, 656-658;
14  4RT 664, 742.) Petitioner was allegedly at the party with his cousin, David
15  Martinez, and his friend, Eddie Sanchez.(1RT 83-84; 4RT 818.) There was, allegedly
16  ,a preexisting animosity between Lopez's friend, Gustavo Rubio, and petitioner's
17  friend, Eddie Sanchez, because both these men were dating the same girl, Corina
18  Martinez, Petitioner's cousin and the sister of David Martinez.(1RT 80-82; 4RT 818
19  -820.) The Martinez family lives on the corner of Winstrom and Casablanca Streets,
   in the heart of the alleged Casablanca gang's turf.(4RT 818-820.)

20      Rubio testified that he knew petitioner from school as did Zavala, but Zavala
21  testified, that he did not know Petitioner(3RT 575-576). Negrette testified also,
22  that he had seen Petitioner approximately four months before at his house. Bonilla
23  said he "kind of knew Petitioner. But Gustavo Rubio, actually told them(the group)
24  petitioner's name as Michael Robles.(3RT 597). Amanda Moya, whose house the party
25  was at, knew Petitioner from the neighborhood. All of them stated that petitioner
26  was at the party, although Moya denied it at trial. Garcia and Lopez, who did not
27  know Petitioner previously, also testified that petitioner was at the party. (1RT
28  84-85, 200-201; 2RT 296-297, 384, 446; 3RT 494-495, 576.)

1    Petitioner and his friends were, allegedly, "mad-dogging" Rubio, Lopez, and
2  their friends by giving them mean looks at the party.(1RT 202-203.) After a couple
3  of hours had passed, Rubio told his friends he wanted to leave because he was
4  getting a bad vibe from petitioner and his friends, allegedly. (1RT 87-88.)

5    As Rubio and his friends began to leave the party, Petitioner's friend, Eddie
6  Sanchez, suddenly ran up behind the group and punched Rubio below his eye with his
7  fist.(1RT 88-89, 204, 244; 2RT 359-364, 425-426; 3RT 525-526, 597.) Rubio's friend
8  , David Garcia, ran after Sanchez and grabbed him, putting Sanchez into a headlock.
9  In the ensuing interval, Rubio and the rest of his friends were able to leave the
10 party area and go to the front yard. (1RT 90-91, 204-244; 2RT 364, 384-386, 425-
11 426.)

12    Rubio was mad, and wanted to fight Sanchez. As Rubio waited in the street for
13 Sanchez to approach him again, Petitioner and another unknown man, allegedly,
14 walked right in front of Rubio. (1RT 90-91, 130-131, 204.) About one minute after
15 Petitioner had, allegedly, walked by, Rubio and his friends heard the sound of
16 gunfire coming from the corner of the street.(1 RT 92.)

17    Petitioner, allegedly, fired at least fourteen rounds from a 9mm handgun at
18 the croud. Although, no one testified that the gun was pointed directly at them,
19 Rubio, Garcia Lopez, Zavala , Bonilla and Negrette, all testified that they saw
20 the fire emanate from the gun. Officer Lavall Nelson, with the Riverside Departme-
21 nt, found 14 shell casing to the right on the intersection.(1RT 90-93, 174-175,
22 207; 2RT 372-375, 503; 3RT 560-562.) The alleged victims testified that all were
23 within 5 feet of each other, at the time the gun fire statrted.( 1RT 99, 175-185.)
24 But Zavala testified Ruben was back away from them(3RT 581), including Garcia and
25 two others went to one car, Negrette, Rubio, Zavala, Bonilla and Lopez all went
26 down, hidding behind cars, when the shooting started.(2RT 366-375, 389-393, 427-
27 430, 500-502; 3RT 559-560.)The Court gave Cal.Jic 8.66.1.(5RT 913-914.) See Fn.1

28    Negrette was bleeding in the stomach and arm area. and was helped to the ba-
   ck seat of the car and the others are trying to staunch it with a shirt. (1RT 100

1  -103, 215-217; 2RT 429;  3RT 504-505, 560.)

2      Doctor Jery Vlasek treated Negrette at Riverside Community Hospital for the

3  gunshot wound to the left side of Negrette's chest and arm. Vlasek performed

4  surgery on Negrette, including removing his spleen and parts of his colon, and

5  closing the hole in his stomach. Vlasek testified that without surgery Negrette

6  would have died. Negrette spent a month in the hospital before being released. He

7  still has numbness in parts of his body and gets tired more easily than he used to

8  before the shooting. (1RT 221-222; 3RT 464-471.)

9      Again, no one in Negrette's group belonged to a street gang. But Negrette's

10  group was aware that petitioner belonged to a gang from before. Negrette testified

11  that four months before the shooting, Petitioner had come by his house claiming to

12  be a gang member. But, more importantingly, no one testified that Petitioner made

13  any claims of his alleged membership to Casablanca that night of the shooting to

14  anyone, NOT even to Negrette's group.(1RT 71-71, 123, 195, 226; 2RT 335; 3RT 497,

    507-508; 4RT 553-554.)

15  <u>Criminal Street Gang Testimony</u>

16      Terry Redfearn, an Officer with the Riverside Police Department, and the

17  main investigator, testified as an expert on criminal street gangs.(3RT 618.)

18      Redfearn interviewed Petitioner about the shooting. Although Petitioner

19  denied he was involved, and in fact was at his grandparent's house in lake

20  Elsinore at the time, he did state that he was a member of the Casablanca Evans

21  Street gang. Petitioner had three Casablanca related tattoos. (3RT 639-641, 652-

22  653.) Petitioner's moniker is : "cyco". (4RT 647-651, 672-673.).

23      Redfearn opined that in this case, the crime was committed for the benefit

24  of the criminal street gang, based on the possed hypothetical question by the

25  prosecution.(4RT 683-686.). Redfearn testified that gang members and their associ-

26  ates boast about the crimes they commit in order for word to spread throughout the

27  community, thereby instilling fear in potential witnesses.(4RT 685, 686.) And the

28  fear, manifested itself in this case, because most of the victims and witnesses

(4).

1  were reluctant to get involved in this case, or to testify against Petitioner,

2  due to their fear of Petitioner and his fellow gang members.(4RT 686.)

3      Interestingly, there was no evidence that any other individual(s) or anybody

4  were identified as being Casablanca gang members, Not Sanchez, nor Martinez, his

5  cousin(petitioner's). (4RT 687.). Redfearn said, practically, that his opinion in

6  whole, is based on the victims speculation, as to why the shooting occurred. (4RT

7  689, lines 23-27.)

8  Defense

9      Petitioner's grandmother, Magdalena Robles, and his father Teodoro Robles,

10  testified that Petitioner was home in Lake elsinore on the night of the shooting.

11  The only person with a car is Teodoro, and he did not give Petitioner a ride that

12  night. They also have a fence around the property that is locked at night. Both

13  Magdalena and Teodoro have keys, but no one else does.(4RT 767-773.)

14      Teodoro had gone to a party the night of the shooting but returned between

15  9:30 and 10:00 p.m. He went to sleep soon after. Petitioner was in his bedroom at

16  that time. Magdalena had trouble sleeping and did not go to sleep until 4:00 or

17  5:00 a.m. Petitioner did not leave that night.(4RT 780-786.)

18      Matthew Parish, an Officer with the Riverside Police Department, interviewed

19  the various witnesses and victims at the hospital. At the time, the only person

20  who said he was the shooter was Negrette. Everyone semed reluctant to speak to

21  him however. (4RT 793-797.)

22      David Martinez is Petitioner's first cousin. Martinez went to the party with

23  Eddie Sanchez. They arrived about one or two hours before Negrette's group did.

24  At the time, there were about 80 people in the backyard.(4RT 825-827.) Around

25  1:00 or 1:30 a.m. people started to leave. Nothing had been going on between

26  Sanchez and Rubio, Although Martinez was aware the two did not like each other.

27  Both had been dating Sanchez's sister. As Sanchez and Rubio were leaving, the two

28  started talking back and forth. MArtinez saw Sanchez hit Rubio. When that occurr-
ed, people formed around the two, while others jumped in to hold off the two from

1  further fighting. That was the extent of the fight.(4RT 820, 829-831.)

2      Martinez stayed in the backyard talking to friends. As he was going around

3  the side yard towards the front, he heard gunshots and went back to the backyard.

4  He waited there until the shots stopped. To him, it sounded like gunshots were

5  going back and forth in the front of the house. When he went in front, the shoot-

6  ing had stopped and people were running to their cars. He did the same and left.

7  He did not see the shooter. However, Petitioner was not at the party that night.

8  (4RT 831-833.)

9  <u>Rebuttal</u>

10    On September 21, 2003, Garcia was playing pool at Lopez's house. He was there

11 with Arial, Lopez and Zavala. At some point between midnight and 1:00 a.m.,

12 Martinez came to the house along with three other people. While Martinez leaned

13 on his car, others got into fight in the street. Martinez said "who ratted out my

14 cousin?" and asked why they went to the police. Martinez also said that Rubio sho-

15 uld be carrying a gun at all times. Martinez said all this to Arial, who was not

16 at the party that night. (4RT 861-867.)

17 ///

18 ///

19 ///

20 <u>Footnote 1</u>:    The Trial Court instructed the jury with Cal.Jic. 8.66.1, which states:

21     " A person who primarily INTENDS to kill one person may also concurrently
       intent to kill other persons within a particular zone of risk. This zone

22     of risk is termed the KILL ZONE. The INTENT is concurrent when the nature
       and the scope of the attack while directed to the primary victim are such

23     that it is reasonable to infer the perpetrator INTENDED to kill the primary
       victim by killing everyone in that victim's vicinity.

       Whether a perpetrator actually INTENDED TO KILL THE VICTIM EITHER AS A

24     PRIMARY TARGET OR SOMEONE WITHIN A KILL ZONE, is an issue to be

25     decided by you."(Cal.Jic.8.66.1--5RT 913-914.)

26     See <u>PEOPLE Vs. BLAND</u>(2002)28 Cal.4th 313, 326-331 n 6.This
       Jury Instruction failed to define intent and malice required

27     to prove the Attempted premeditated murder convictions, as
       to each individual victim.

28     The California Supreme Court conceded that this concurrent
       intent instruction <u>is not</u> a legal doctrine.(id p.331 n 6.)

GROUNDS FOR RELIEF (1. THRU 3.)

### GROUND 1

THE STATE DEPRIVED PETITIONER OF DUE PROCESS OF LAW,
BECAUSE THE EVIDENCE FAILED TO SUPPORT, BEYOND A
REASONABLE DOUBT, THE ATTEMPTED PREMEDITATED MURDERS,
OF GARCIA( count 5 ), NEGRETTE( count 1 ), RUBIO(count
2 ), LOPEZ( count 3 ), AND ZAVALA( count 4 ), CONVICTIONS

The State denied petitioner his due process right to a fair jury trial,
because the evidence failed to support each and every attempted premeditated
murder convictions beyond a reasonable doubt. To satisfy the Due Process Clause,
"substantial evidence" must exist as to each element of each crime charged. (See
JACKSON Vs. VIRGINIA(1979) 443 U.S. 307, 319.)

The Fifth and Sixth Amendments, applicable to the States through the
Fourteenth Amendment, guarantee a criminal defendant the right to have a jury
determine guilt beyond a reasonable doubt on every element of a charged offense.
(UNITED STATES Vs. GAUDIN(1995)515 U.S. 506, 509-511; INRE WINSHIP(1970)397 U.S.
358, 359; see also CAGE Vs. LOUISIANA(1990)498 U.S. 39.)

The same standard of review is used by California in determining the
Sufficiency of the evidence--that is evidence that's reasonable, credible, and of
solid value.(PEOPLE Vs. JOHNSON(1980)26 Cal.3d 557,575-578.)

Relevant here is, the Felony-Murder Rule, which is the doctrine holding that
any death resulting from the commission or attempted commission of a felony is
murder. Such rule eliminates the need to prove MALICE.(See PEOPLE Vs.ROBERTSON
(2004)34 Cal.4th 156, 165-166.) This is a legal doctrine, as is the "Transferred
Intent" doctrine.(See PEOPLE Vs. BLAND(2002)28 Cal.4th313, 330-333.) But the Kill
Zone(Concurrent intent) is not a legal doctrine.( id at p. 331, n 6.) Thus not
requiring special instructions.(See Also PEOPLE Vs. ANZALONE(2006)141 Cal.App.4th
380, 392.)

Hence, the BLAND'S kill zone (concurrent intent) instruction fails to pass
Constitutional scrutiny here. In essence, this BLAND instruction eliminates the
need to prove MALICE, and a SPECIFIC INTENT TO KILL a specific victim. The Jury
is asked to presume INTENT exists, and all they have to do is find who is in the
Kill Zone, if any. As explained in BLAND, supra, this analogy is a fusion of two
legal doctrines, Transferred Intent and Felony-Murder, plus sister State cases
cited in BLAND.

For argument purposes, it is assumed that Negrette was the primary victim,
based on the injuries sustained the night of the shooting.

So, (1) Is there sufficient evidence, that Petitioner Intended to kill

1  NEGRETTE(count 1), with malice aforethought ?, with deliberation and premeditation ?,
2  and if so, does the existing INTENT towards Negrette transfers to each alleged
   victim in this case, under Federal Due Process ?, including the findings of will-
3  ful, deliberate and premeditation to all the alleged victims in this case ?.( See
4  e.g., SULLIVAN Vs. LOUISIANA(1993)508 U.S. 275,278-280[right to jury trial and Due
   Process violated by instruction permitting jury to find guilt by standard LESS
5  than "beyond a reasonable doubt"].) Also interestingly, the jury found true the
6  use of firearm enhancement, as to each victim in this case, irrespective of the
   language of that enhancement which requires that great bodily injury result to
7  each of the victims, under California Penal Code section §12022.53(d). The
8  Prosecution failed to include the right enhancement, as to the NON-INJURED victims
9  (counts 2-5), which is section §12022.53(c). The Prosecution misled the jury to
   believe that all the enhancements attach to all the counts in this case.( 5RT 931-
10 935.)
11     These issues, encompassed in this ground 1, are cognizable in this Petition,
12 under either the PLAIN ERROR DOCTRINE and/or Ineffective assistance of both Trial
   and/or appellate counsel, which resulted in prejudice to petitioner at his trial
13 and/or direct appeal, by their failure to raise these issues and protect this
14 petitioner's Constitutional rights.(e.g.,SMITH Vs. ROBBINS(2000)528 U.S. 259, 285-
15 289.) The BLAND jury instruction was given to the jury, to be applied to all the
   counts, thus, if this Court finds error, as to GARCIA(count 5), this Court should
16 find that the error affected the other counts, as a matter of law. (SULLIVAN,supra
17 ,at p.278-280.) This way, it would avoid extensive litigation, filings and
   resources, that this Court can use on other matters.
18           THE FOLLOWING FACTS SUPPORT THIS CLAIM(S):
19 1.)  Under California law, the crime of attempted murder requires a Specific
20 Intent to kill. (PEOPLE Vs. MURTISHAW(1981)29 Cal.3d 733, 764; PEOPLE Vs. SNYDER
   (1940)15 Cal.2d 706, 708; PEOPLE Vs. MACIEL(1925)71 Cal.App. 213, 215-216.)
21 2.)  Such INTENT can be inferred from the facts AND circumstances surrounding
22 the crime, including the nature of the assault, the weapon used and seriousness of
   the wounds.(see, e.g., PEOPLE Vs. BECERRA(1963)223 Cal.App.2d 448, 450; PEOPLE Vs.
23 DORSEY(1969)270 Cal.App.2d 423, 428; see PEOPLE Vs. SMITH(2005)37 Ca.4th 733, 739.)
24 3.)  However, the SPECIFIC INTENT TO KILL must be proved, and it CAN NOT be
25 inferred merely from the commission of another dangerous crime. (PEOPLE Vs. BELTON
   (1980)105 Cal.App.3d 376, 380; see also PEOPLE Vs. COLLIE(1981)30 Cal.3d 43, 62;
26 cf. PEOPLE Vs.RATLIFF(1986)41 Cal.3d 675, 695-696 ["defendant's acts of shooting
27 his victim at close range DID NOT so conclusively demonstrate an INTENT to kill as
28 to render harmless the error in instructions", citing PEOPLE Vs. JOHNSON(1981)30
   Cal.3d 444, 447-449].)

4.) The California Supreme Court had conceded in PEOPLE Vs. BLAND(2002)28 Cal. 4th 313, 331 n 6, that the concurrent intent analogy is not a legal doctrine. Interestingly, the Appellate Court, in the Fourth Appellate District, reversed 3 out of 4 attempted murder convictions, based on ineffective assistance of counsel, in failing to object to the prosecution's closing/opening argument, that was based on the BLAND analogy.( See PEOPLE Vs. ANZALONE(2006)141 Cal.App. 4th 380, 394-396.) This is the same Appellate court that denied this petitioner's direct appeal.(see Appeal Case No.# E037482, in appendix A.)

5.) It is Note worthy that in all cases where gang evidence is admitted,(to show Intent and Motive to kill), there are articulable facts about the event which support its relevance and admissibility.(PEOPLE Vs. OLGUIN(1994)31 Cal.App.4th 1355[shooting between defendant and victim linked to an earlier incident where victim's gang crossed out graffiti belonging to defendant's gang]; PEOPLE Vs. GAMEZ(1991)235 Cal.App.3d 957[shooting between defendant and victim tied to rivalry between Southside and Highland Street gangs]; PEOPLE Vs. CONTRERAS(1983) 144 Cal.App.3d 749[the robbery of four off-duty security guards by defendant and several cohorts tied to defendant's earlier statements at a gang meeting that the gang could obtain money for dope and beer by robbing the security guards];PEOPLE Vs. GARDELEY(1996)14 Cal.4th 605[ a " classic example " of promotion of gang- activities where the gang-members assaulted a person in their drug-selling area in order to intimidate resident witnesses, who may have watched the beating, from contacting the Police; cited in GARCIA Vs.CAREY(9th cir.2005)395 F.3d 1099, 1104.)

6.) Under California law, premeditation requires MORE than the intent to kill; it requires that " the intent to kill was formed upon a preexisting reflection and was the subject of actual deliberation and forethought."(PEOPLE Vs. VAN RONK (1985)171 Cal.App.3d 818, 823; citing PEOPLE Vs. ROWLAND(1982)134 Cal.App. 3d 1, 7-9.)

7.) In PEOPLE Vs. ANDERSON(1968)70 Cal.2d 15, the Califronia Supreme Court identified three categories of evidence relevant to resolving the issue of

premeditation and deliberation: planning activity, motive, and manner of killing. (id at p. 26-27, see also PEOPLE Vs. PEREZ(1992)2 Cal.4th 1117, 1125; PEOPLE Vs. WELCH(1999)20 Cal.4th 701, 758.) The Court stated that, to sustain a jury finding of premeditation, there must be:"(1) Facts...which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing--what may be characterized as 'planning' activity; (2)Facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which...would in turn support an inference that the killing was the result of 'a pre-existing reflecti-on' and 'careful thought and weighing of considerations' rather than mere unconsidered or rash impulse hastily executed'[citation]; (3) Facts...from which the jury could infer...defendant must have intentionally killed according to a 'preconceived design.'"(ANDERSON, supra, at 26-27.) ANDERSON was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of pre-existing reflection rather than UNCONSIDERED OR RASH IMPULSES.(PEOPLE Vs.COMBS(2004)34 Cal.4th 821, 850,and such factors are not an exhaustive list to be considered, and does not require that these factors be present in a particular combination; PEOPLE Vs. PEREZ, supra, at p. 1125["ANDERSON factors...are not a sine qua non to finding first degree premeditated murder, nor are they exclusive"].)

8.)  Under California Penal Code Section 664, if the crime attempted is willful, deliberate, and premeditated murder, the defendant must be punished by state imprisonment for life with the possibility of parole. Otherwise, the punishment would be five, seven, or nine years.( See PEOPLE Vs. BRIGHT(1996)12 Cal.4th 652, 665.)

9.) The evidence here failed to show any planning activity beyond that of an opportunistic shooting. No facts showed any thought and weighing of consideration rather than a rash, impulse and hastily executed shooting.(cf.PEOPLE Vs. ANZALONE, supra, citing PEOPLE Vs. SMITH(2005), supra, the Court of Appeal held

1   that the prosecution's argument that, like in the instant case, attempted murder

2   was committed as to all persons in group simply because gunshots was fired at them

3   INDISCRIMINATELY,(Cal.Jic. 8.66.1), (5RT 913-914.) was a prejudicial error, since

4   the Kill Zone(danger zone) argument did not, as like in this instant case, define

5   Zone of Danger as it related to intent, it merely told the jury to transfer the

6   intent to all those found in a Kill Zone. Thus, lighten the prosecution's burden

7   of proof.(SANDSTROM Vs. MONTANA(1979)442 U.S. 510, 519[in murder prosecution,

8   instruction told jurors that individual is presumed to intend ordinary consequen-

9   ces of voluntary acts].)

10.)  The evidence fails to show that, assuming arguendo, the petitioner, at the

11   time of the shooting devulged his gang-membership to any of the victims. The

12   victims speculation that, since petitioner is a gang-member, learnt later after

13   the shooting by the police, is evidence of Motive and Intent to kill. Direct on

14   point, about the mere membership of a defendant to a street gang is irrelevant to

15   the crime, is DAWSON Vs. DELAWARE(1992)503 U.S. 159. In DAWSON, The United States

16   Supreme Court agreed with petitioner's argument that the introduction of gang

17   evidence violated his right under the First and Fourteenth Amendments and reverse

18   the case. Critical to the Court's Analysis is the fact that the gang evidence was

19   not relevant to any of the issues involved in the sentencing(i.e.,crimes)

20   proceeding. The Court said:"Even if the defendants here belong to a criminal

21   street gang whose members endorse violence, that fact has no relevance UNLESS

22   there is something about the 'CRIME', which TIES it to the beliefs and over-

23   arching criminal purpose of the gang.

24        In the instant case, Petitioner's membership to Casablanca street gang, did

25   not tie-up, until RUBIO was allegedly, reluctant to give petitioner's name,albeit

26   gave to all of his friends and to the police 10 days after the shooting. There

27   was no other gang-members from Casablanca, as evidence, nor evidence that gang-

28   members from Casablanca intimidated any of the victims or witnesses or threaten

29   any one for the shooting. David Martinez is not a Gang-members, nor affiliated

with Casablanca street gang, nor was Eddie Sanchez.

Equally damning is the fact that the shooting took place in front of numerous witnesses. The fact that a killing takes place in an isolated area implies premeditation, PEOPLE Vs. SILVA(2001)25 Cal.4th 345, 368-369[ " A rational trier of fact infer instead that defendant selected this location because it was a place where no potential witnesses or rescuers could see them[.]...Thus, the murder's isolated location, selected by defendant, is itself evidence of planning[.]"]; therefore, the fact that a shooting takes place in front of numerous witnesses implies a lack of premeditation and deliberation. Moreover, none of the usual indicia of premeditation is present in this case. The method of shooting does not imply premeditation, COMPARE ; PEOPLE Vs. HAWKINS(1995)10 Cal.4th 920, 956 [manner of the killing implies an execution-style murder]; PEOPLE Vs. LUNAFELIX(1985)168 Cal. App.3d 97, 102[ the victim was disabled by the first one or two shots and his body began to roll under a table. After a pause, appellant fired the third and fourth shots, which indicated appellant's intent to make sure the victim died ]; also see PEOPLE Vs. OVERMAN(2005)126 Cal.App.4th 1344 [defendant shot at co-workers, with a SKS assault rifle, indiscriminately, Officer Nava found several bullets, but no bullet holes were found throughout the property, after defendant was fired a third time.].

Nor was there evidence of any pre-existing animosity between each victim, and Petitioner. Indeed, there is no evidence of motive at all, directly attached to Petitioner.

11.) Without any other reliable, credible evidence, the evidence failed to sustain each of the convictions, independently, against Petitioner beyond a reasonable doubt, and his convictions violated his Constitutional rights to Due Process , a fair jury trial, and proof beyond a reasonable doubt, as to each count charged. The Transferred Intent Doctrine does not apply to attempted murder cases, thus the intent does not transfer from each victim.( See BLAND, supra.)

Petitioner request for relief, and his petition should be granted.

GROUND    2 --------

THE STATE DEPRIVED PETITIONER OF DUE PROCESS OF LAW,
BECAUSE THE EVIDENCE FAILED TO SUPPORT, BEYOND A
REASONABLE DOUBT, THAT PETITIONER COMMITTED THE CRIMES
FOR THE SPECIFIC PURPOSE OF PROMOTING OTHER CRIMINAL
ACTIVITIES OF THE CASABLANCA CRIMINAL STREET GANG.

The State denied petitioner his due process right to a fair jury trial,
because the evidence failed to support the true finding(s) that petitioner had
committed the crimes charged, for the specific purpose of promoting other criminal
activities of the Casablanca criminal street gang, beyond a reasonable doubt. To
Satisfy the Due Process Clause, " substantial evidence " must exist as to each el-
ement of each of the enhancements of Penal Code Section §186.22 charged. ( See
JACKSON Vs. VIRGINIA(1979)443 U.S. 307, 319.)

The  Fifth and Sixth Amendments, applicable to the States through the
Fourteenth Amendment, guarantee a criminal defendant the right to have a jury
determine guilt beyond a reasonable doubt on every element of a charged offense.
(UNITED STATES Vs. GAUDIN, supra, p. 509-511; INRE WINSHIP, supra, p. 359; see
also CAGE Vs. LOUISIANA, supra, p. 39.)

In reviewing an insufficiency claim as to the Gang enhancement, a reviewing
court is to utilize the same standard as with other claims of insufficient evide-
nce.(cf.Ibid.; PEOPLE Vs. JOHNSON(1980)26 Cal.3d 557, 576; PEOPLE Vs. HICKS(1982)
128 Cal.App.3d 423, 429.)

Penal Code Section §186.22, subdivision (b)(1)requires proof that Petitioner
not only committed the robbery(i.e., attempted premeditated murders) for the
benefit of a criminal street gang, but that he did so with the Specific Intent to
promote, further or assist in criminal conduct by gang members of Casablanca. (cf.
PEOPLE Vs. ORTIZ(1997)57 Cal.App.4th 480, 484; PEOPLE Vs. GARDELEY(1996)14 Cal.4th
605, 616-619.)

Instead of convicting petitioner based on evidence, the jury convicted  this
petitioner based on his gang affiliation. By doing so, the prosecution denied
petitioner due process of law and a fair jury trial in violation of his federal
Constitutional rights. Various Circuit Courts warn of the dangers of admitting
gang evidence due to its prejudicial effect on a defendant. (See, e.g.,UNITED
STATES Vs. IRVIN( 7th cir.1996)87 F.3d 860, 865["gangs...often invoke images of
criminal activity and deviant behavior. There is therefore always the possibility
that a jury will attach a propensity for committing crimes to defendants who are
affiliated with gangs or that a jury's negative feeling toward gangs will influence
its verdict"].)

(13).

1   The State and/or Respondent on Appeal characterized petitioner's gang-member-
2   ship, to be overwhelmingly established.(Respondent's brief, p.12, #E037482)

3   As argued previously, in ground 1, in (5 & 10), assuming arguendo, petitioner
4   is a gang member, this membership is protected by the First and Fourteenth Amend-
    ments to the U.S. constitution.(DAWSON Vs. DELAWARE(1992)503 U.S. 159.) Thus, if
5   the reviewing court takes the Harmlessness standard of review here, by removing
6   petitioner's gang membership from the evidence and case, What do you have left ?.
    Absolutetly nothing.

7   Taking the respondents argument, that the petitioner, at the time of the
8   shooting, he wanted to impose his will;(since when is imposing your will a
9   criminal conduct, as a matter of law ?.)This argument by the prosecution, was a
    simple way of telling the jury, Convict petitioner, his is Cyco, he is violent,
10  because we have shown overwhelming evidence that he is a member of Casablanca. So,
11  What happened to the crimes ?. The evidence had to establish that petitioner, at
12  the time of the shooting, he committed those attempted premeditated murders, to
    promote, further, and assist other criminal activities of Casablanca street gang,
13  and not, because of some happentence, the alleged victim(Garcia) or (Negrette)
14  remember petitioner to claim a gang, thus they are fearful of cooperating with
    the police. That's secondary to the actual crimes, allegedly committed. It is
15  absolutely possible to feel fear after such an incident.(See PEOPLE Vs. OLGUIN
16  (1994)31 Cal.App.4th 1355, 1368[ Ulloa--witnessed the shooting--admitted he left
    the scene of the shooting and did not voluntarily provide information to the
17  Police, explaining " I didn't want anything to happen to my house or to my
18  family"; Ulloa received direct threats to watch his back, called him a RAT; this
    evidence was admitted over the defense objection, for the witness'state of mind,
19  i.e., his Credibility].)

20  This Opinion testimony by Officer redfearn is insufficient because it lacks
21  Foundation in the circumstances of the CRIME. "Like a house built on sand, the
    expert's opinion is NO better than the facts on which it is based."[citation].
22  (PEOPLE Vs. GARDELEY, supra, p.619.). Also, Assumptions made by an expert are
23  NOT EVIDENCE.(PEOPLE Vs. BOX(2000) 23 Cal.4th 1153, 1203[the jury was properly
    instructed that assumptions made by an expert were not evidence...].)It's
24  Speculation, but "speculation is not evidence, less still Substantial evidence."
25  [citation].(PEOPLE Vs. WAIDLA(200)22 Cal.4th 690, 735; PEOPLE Vs. FELIX(2001)92
26  Cal.App.4th 905, 912, citing TAYLOR Vs. KENTUCKY(1978)436 U.S. 478, 487; see also
    ESTELLE Vs. WILLIAMS(1976)425 U.S. 501, 503[in the administration of justice,
27  court must carefully guard against DILUTION of the principle that guilt is to be
28  established by probative evidence and beyond a reasonable doubt].)

(14).

Officer redfearn's opinion is simply that the shooter acted with a certain intent. As recently explained by IN RE FRANKS S. (2006)141 Cal.App. 4th 1192, this is insufficient evidence to sustain the gang enhancement. (id at p. 1194-1196.)

In GARCIA Vs. CAREY(9th cir.2005)395 F.3d 1099, a recent Ninth Circuit case on this issue, the court granted the defendant's habeas corpus petition that insufficient evidence supported the gang enhancement. In that case GARCIA was a member of EMF(El Monte Flores), a criminal Street Gang. In the early morning hours, GARCIA and two companions stopped a person as he came out of a liquor store in the gang's TURF of El Monte Flores. GARCIA took some money from the person's pocket and stole his bicycle. Santos Hernandez, an El Monte Police Detective, testified as an expert on gangs. He testified that the gang was TURF ORIENTED and that three other robberies, often involving small amounts of money, were one of the gang's primary activities. (id at pp. 1101-1102.) The Appellate Court ultimately upheld the District Court's finding that the case lacked any evidence that the robbery was somehow in furtherance of other crimes by the gang.

As the Court may know, gang evidence is EXTREMELY PREJUDICIAL. As most courts dealing with gang evidence recognize, gang evidence is extremely prejudicial,(See PEOPLE Vs. COX(1991)53 Cal.3d 618, 660; PEOPLE Vs. MAESTAS(1993)20 Cal.App.4th 1482, 1497; UNITED STATES Vs. IRVIN,supra, p.864; PEOPLE Vs. PEREZ(1981)114 Cal. App.3d 470), and should be admitted ONLY if relevant and if the proponent of the evidence can carefully articulate a theory of admissibility.(See PEOPLE Vs. CARDENAS(1982)31 Cal.3d 897, 904-905.)

Since, in the instant case, the prosecution used gang evidence to formulize its theory of culpability,(Although Defense Counsel was ineffective in giving a special instruction, like Cal.Jic 2.50, to limit the gang evidence to Intent and motive to kill), the erroneous admission of the gang evidence, as its insufficiency is obvious, affected the crimes charged, and undermine the reliability of those convictions, and such convictions should be reversed,

Ultimately, it seems that it was over or about a girlfriend being dated by someone out of the area(non-gang member) which, like some Westside Story production, led to a shooting.(e.g., MITCHELL Vs. PRUNTY(9th Cir.1997)107 F.3d 1337, 1342, overruled on other grounds.)

This court should find that insufficient evidence linked the crime with any specific intent to promote, further or assist the commission of other gang-related crimes. As such, this court should reverse ALL the true findings regarding Penal Code Section §186.22, subdivision(b).

Petitioner prays for the relief to be granted.

///

GROUND    3------

IMPOSITION OF CONSECUTIVE TERMS VIOLATED PETITIONER'S
FEDERAL CONSTITUTIONAL RIGHTS TO A JURY TRIAL AND PROOF
BEYOND A REASONABLE DOUBT UNDER THE SIXTH AND FOURTEENTH
AMENDMENTS AND BLAKELY Vs. WASHINGTON(2004)542 U.S. 296,
UNDER CUNNINGHAM Vs. CALIFORNIA(2007)549 U.S.___,No. 05-
6551, dissaproving PEOPLE Vs. BLACK(2005)35 Cal.4th 1238

The Trial Court sentenced Petitioner to five separate terms for attempted
premeditated murder, running each of the sentences CONSECUTIVE to each other.(5RT
1007.) The imposition of consecutive terms violates Petitioner's rights under the
Sixth and Fourteenth Amendments to have all factors that would increase his
sentence decided by a jury.(BLAKELY Vs.WASHINGTON(2004)542 U.S. 296,313.[herein-
BLAKELY].)

The California Supreme Court, in the instant case, denied ground 3, without
prejudice to any relief to which Petitioner might be entitled after the United
States Supreme Court determines in CUNNINGHAM Vs. CALIFORNIA, supra, No. 05-6551,
the effect of BLAKELY and BOOKER would have on California law.(See Order by the
California Supreme Court, No. S-146360, attached hereto.)

Nevertheless, petitioner to assure constitutional adherence to the Sixth and
Fourteenth Amendments, by the California courts, argues ground 3 here.

This Court has matter jurisdiction on ground 3, because the Appellate court,
denied ground 3, without making a reasonable review of Constitutional Law. By
simply stating that the Appellate court was bound to follow the BLACK's decision,
under AUTO EQUITY SALES, INC. Vs. SUPERIOR COURT(1962)57 Cal.2d 450, 455-456. The
Appellate court, unreasonably, failed to adhere to UNITED STATES SUPREME COURT
PRECEDENT, that is BLAKELY.

This court should remand this case for jury trial, as to the determination of
the applicability of factors justifying consecutive terms.

Because the error involves the fundamental right to a jury trial, as well as
the application of the appropriate burden of proof as to the factual determination
, the error is a structural error, requiring reversal PER SE.(SULLIVAN Vs.
LOUISIANA(1993)508 U.S. 275, 279, 306-307; ARIZONA Vs. FULMINANTE(1991)499 U.S.279
[although most constitutional errors are subject to harmless error review, some
errors, such as structural defects in the trial mechanism, would defy such analy-
sis.(See also NEW JERSEY Vs. NATALE(August 2, 2005)__N.J.__,2005 N.J. LEXIS 938,*
67[reversal for resentencing without consideration of Prejudice].)

This court should reverse the consecutive sentences based upon a violation of
Petitioner's Sixth and Fourteenth Amendments rights.

Petitioner prays that this entire Petition is GRANTED.

## VERIFICATION

STATE OF CALIFORNIA

                                    ss.

COUNTY OF KINGS

        I, Michael Ray Robles, declare as follows:

1.) I am the petitioner in this action. I have read the foregoing petition for writ of habeas corpus and the facts stated therein are true of my own knowledge, except as to matters that are therein stated on my own information and belief, and as to those matters I believe them to be true.

        I, Michael Ray Robles, declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at CORCORAN, California, on October 10, 2007.


                                    Michael Ray Robles # V-69864
                                    Declarant/ Petitioner
                                    In Propria Persona

///

///

///

## CAUSE EXCUSES ANY PROCEDURAL DEFAULT

Petitioner asserts that no procedural default has occurred as to any claim set forth that would preclude federal habeas review. However, if any has, there exists cause and prejudice sufficient to excuse any such default.(JACKSON Vs. ROE(9th Cir 2005)425 F.3d 654, 661-662;  RHINES Vs.WEBER(March 30, 2005)__U.S.__,125 S.Ct.1528 ,1535-1536[Pro Se habeas petitioners do not come well trained to address tricky exhaustion determinations].)

Petitioner was denied the required effective Assistance of Counsel , and has to rely on Jail-house lawyers, and limited access to the Law Library, because Petitioner is in custody at a level 4, 180 program(Highest security), he just became aware that he could proceed to this Federal court with this Petition, with the issues raised herein.

## CONCLUSION

Accordingly, Petitioner prays for the court to:

1.) Issue an order to show cause to respondent to inquire into the legality of petitioner's incarceration;

2.) Direct Respondent to file with this Court a full and complete copy of the record of the proceedings that occurred in the California Courts;

3.) Grant petitioner leave to conduct such discovery as has been and shall later be requested by petitioner upon a showing of good cause;

4.) Hold an evidentiary hearing on the Claims, and Appoint Counsel to protect Petitioner's Constitutional rights, as he is Indigent;

5.) Issue a writ of Habeas Corpus pursuant to 28 U.S.C. §2254 to have Petitioner brought before it so that he may be discharged from his Unconstitutional confinement and restraint and to reverse his convictions; and

6.) Grant other relief as appropriate and as law and Justice require.

Dated:  October 10, 2007

RESPECTFULLY SUBMITTED,

Michael Ray Robles #V-69864
Petitioner
In Propria Persona

THE CALIFORNIA SUPREME COURT'S ORDER DENYING PETITION FOR
REVIEW (CASE NO. S-146360.) En Banc

Court of Appeal, Fourth Appellate District, Div. 2 - No. E037482
**S146360**

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

THE PEOPLE, Real Party in Interest,

v.

MICHAEL RAY ROBLES, Defendant and Appellant.

Petition for review denied without prejudice to any relief to which defendant might be entitled after the United States Supreme Court determines in *Cunningham v. California*, No. 05-6551, the effect of *Blakely v. Washington* (2004) 542 U.S. 296 and *United States v. Booker* (2005) 543 U.S. 220, on California law.

SUPREME COURT
**FILED**

OCT 1 1 2006

Frederick K. Ohlrich Clerk

DEPUTY

**GEORGE**

Chief Justice

<u>APPENDIX    A</u>--------

This Appendix includes the following:
( 1.) Petition for Review, filed by Steven A. Torres
   on behalf of Petitioner; and

( 2.) Attached to the Petition for Review, is a copy
   of the Court of Appeal, Fourth Appellate District,
   Division two, opinion in Case No. E037482.

IN THE SUPREME COURT OF THE

STATE OF CALIFORNIA

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | NO. _____ |
| | ) | (APPEAL No. E037482 |
| Plaintiff and Respondent, | ) | Riverside Co. No. |
| | ) | RIF111919) |
| vs. | ) | |
| | ) | |
| | ) | |
| MICHAEL RAY ROBLES, | ) | |
| | ) | |
| Defendant and Appellant. | ) | |
| | ) | |

Appeal from the Superior Court of Riverside County
Honorable EDWARD D. WEBSTER

**PETITION FOR REVIEW**

STEVEN A. TORRES, ESQ.  (SBN 144381)
TORRES & TORRES
PMB 332
3579 East Foothill Boulevard
Pasadena, California 91107
(626) 836-5855
Attorneys for Defendant and Petitioner
MICHAEL RAY ROBLES

**Under appointment of the Court of Appeal under the
Appellate Defenders, Inc. independent case system**

IN THE SUPREME COURT OF THE

STATE OF CALIFORNIA

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) | NO. _____ |
| | ) | (APPEAL No. E037482 |
| Plaintiff and Respondent, | ) | Riverside Co. No. |
| | ) | RIF111919) |
| vs. | ) | |
| | ) | |
| | ) | |
| MICHAEL RAY ROBLES, | ) | |
| | ) | |
| Defendant and Appellant. | ) | |
| | ) | |

Appeal from the Superior Court of Riverside County
Honorable EDWARD D. WEBSTER

---

**PETITION FOR REVIEW**

---

STEVEN A. TORRES, ESQ.  (SBN 144381)
TORRES & TORRES
PMB 332
3579 East Foothill Boulevard
Pasadena, California 91107
(626) 836-5855
Attorneys for Defendant and Petitioner
MICHAEL RAY ROBLES

**Under appointment of the Court of Appeal under the
Appellate Defenders, Inc. independent case system**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES                                    iii

PETITION FOR REVIEW                                     1

STATEMENT OF THE ISSUES                                 3

STATEMENT OF THE CASE                                   4

STATEMENT OF FACTS                                      6

ARGUMENT                                                14

I.    INSUFFICIENT EVIDENCE SUPPORTED THE
      CONVICTION THAT PETITIONER ATTEMPTED TO
      MURDER GARCIA GIVEN THAT HE WAS ALREADY IN
      HIS CAR WHEN THE SHOOTING STARTED AND WAS
      IN A DIFFERENT CAR THAN ALL THE OTHER
      VICTIMS.                                          14

      A.    Introduction.                               14

      B.    Reasons For Granting Review.                15

II.   INSUFFICIENT EVIDENCE SUPPORTS THE TRUE
      FINDING THAT PETITIONER COMMITTED THE CRIME
      FOR THE PURPOSE OF PROMOTING OTHER CRIMINAL
      ACTIVITIES OF THE CASABLANCA CRIMINAL STREET
      GANG.                                             17

      A.    Introduction.                               17

      B.    Reasons For Granting Review.                18

III.  IMPOSITION OF AN CONSECUTIVE TERMS VIOLATED
      PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO
      A JURY TRIAL AND PROOF BEYOND A REASONABLE
      DOUBT UNDER THE SIXTH AND FOURTEENTH
      AMENDMENTS AND *BLAKELY V. WASHINGTON* (2004)
      542 U.S. 296 [124 S.CT. 2531, 159 L.ED.2D 403], DESPITE

THE CALIFORNIA SUPREME COURT'S DECISION IN
*PEOPLE V. BLACK* (2005) 35 CAL.4TH 1238.                    23

CONCLUSION                                                    28

WORD COUNT CERTIFICATION                                      29

COURT OF APPEAL OPINION                              Appendix

## TABLE OF AUTHORITIES

| CASES | PAGE |
|---|---|
| *Arizona v. Fulminante* (1991) 499 U.S. 279 | 26 |
| *Blakely v. Washington* (2004) 542 U.S. 296 | 23, 25 |
| *Garcia v. Carey* (9th Cir. 2005) 395 F.3d 1099 | 18, 20 |
| *In re Winship* (1970) 397 U.S. 358 | 15 |
| *Jackson v. Virginia* (1979) 443 U.S. 307 | 15, 22 |
| *Lopez v. People* (Colo. 2005) 113 P.3d 713 | 26 |
| *New Jersey v. Natale* (2005) 184 N.J. 458 | 25, 27 |
| *People v. Black* (2005) 35 Cal.4th 1238 | 25 |
| *People v. Bland* (2002) 28 Cal.4th 313 | 14 |
| *People v. Leung* (1992) 5 Cal.App.4th 482 | 24 |
| *People v. Powell* (1980) 101 Cal.App.3d 513 | 24 |
| *People v. Romero* (2006) 140 Cal.App.4th 15 | 18 |
| *People v. Rowland* (1992) 4 Cal.4th 238 | 15, 22 |
| *People v. Scott* (1994) 9 Cal.4th 331 | 24 |
| *Smylie v. State* (Ind. 2005) 823 N.E.2d 679 | 26 |
| *State v. Brown* (2004) 209 Ariz. 200 | 26 |
| *State v. Dilts* (2004) 337 Ore. 645 | 26 |
| *State v. Gomez* (Tenn. 2005) 163 S.W.3d 632 | 26 |

iii

*State v. Hughes* (2005) 154 Wn.2d 118                                    26

*State v. Shattuck* (Minn. 2004) 689 N.W.2d 785                          26

*Sullivan v. Louisiana* (1993) 508 U.S. 275                             26, 27


**STATUTORY PROVISIONS**                                    **PAGE**

Cal. Const., art. I, § 15                                        15

Cal. Rules of Court, rule 4.406                                  24

Cal. Rules of Court, rule 4.420(a)                              24

Cal. Rules of Court, rule 4.420(b)                              24

Cal. Rules of Court, rule 4.425(b)                             24, 25

Pen. Code, § 136.1, subd. (a)                                   20

Pen. Code, § 186.22, subd. (b)                                4, 11, 17

Pen. Code, § 187, subd. (a)                                      4

Pen. Code, § 245, subd. (a)(1)                                  10

Pen. Code, § 664                                                 4

Pen. Code, § 669                                                24

Pen. Code, § 1170, subd. (b)                                   23, 24

Pen. Code, § 1202.4, subd. (b)                                   5

Pen. Code, § 1202.45                                             5

Pen. Code, § 1237                                                5

Pen. Code, § 12022.53, subd. (b)                    4

U.S. Const., 6th Amendment                          23

U.S. Const., 14th Amendment                         23

IN THE SUPREME COURT OF THE

STATE OF CALIFORNIA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, ) | NO. _____ |
| ) | (APPEAL No. E037482 |
| Plaintiff and Respondent, ) | Riverside Co. No. |
| ) | RIF111919) |
| vs. ) | |
| ) | |
| ) | |
| MICHAEL RAY ROBLES, ) | |
| ) | |
| Defendant and Appellant. ) | |
| ) | |

Appeal from the Superior Court of Riverside County
Honorable EDWARD D. WEBSTER

---

**PETITION FOR REVIEW**

---

Defendant and petitioner Michael Ray Robles hereby petitions this court

for review of the unpublished opinion of the Court of Appeal, Fourth Appellate

District, Division Two, filed July 31, 2006, affirming in whole the judgment

1

and disposition.    The Opinion of the Court of Appeal is attached as an appendix.

Review is necessary to settle important questions of law.    Petitioner respectfully requests that review be granted to him.

Dated:  September 1, 2006          **TORRES & TORRES**

STEVEN A. TORRES
Attorneys for Defendant and
Petitioner Michael Ray Robles

## STATEMENT OF THE ISSUES

1.      Was there sufficient evidence that a victim was inside the "kill-zone" when he was inside a car, which sped away when the shooting started, albeit was near where people were standing who were shot at?

2.      Does the current crime need to promote one of the gang's criminal enterprises?

3.      Did the court violate petitioner's Sixth Amendment rights when it imposed the upper term of six years based upon facts not found true by a jury pursuant to *People v. Blakely* (2004) 542 U.S. 296?

3

## STATEMENT OF THE CASE

An information charged petitioner, Michael Ray Robles, with five counts of attempted murder in violation of Penal Code section 664 and section 187, subdivision (a). In addition, the information alleged that as to each count, petitioner had committed the crimes for the benefit of a criminal street gang, within the meaning of Penal Code section 186.22, subdivision (b). The information also alleged as to each count that petitioner personally fired a handgun causing great bodily injury, within the meaning of Penal Code section 12022.53, subdivision (d). (CT 54-57.)

On December 1, 2003, petitioner pled not guilty and denied the enhancements contained in the information. (CT 60.)

On December 6, 2004, during the second day of trial, the court granted petitioner's *Wheeler* motion regarding African-American jurors. The court declared a mistrial. (CT 93-94.)

On December 17, 2004, the jury found petitioner guilty of all counts and found all enhancements to be true. (CT 174-175.)

On February 4, 2005, the court denied petitioner's request to sentence petitioner concurrently as to each charge. For Count 1, the court sentenced petitioner to the indeterminate term of 15 years to life for the attempted murder charge and 25 years to life for the gun use enhancement resulting in great

4

bodily injury, for a total of 40 years.  The court did the same for each of the other four attempted murder convictions, ordered that all should run consecutive to Count 1, resulting in a total indeterminate sentence of 200 years to life.  As to the gang enhancement, the court ordered that petitioner could not be considered for probation until he had served a minimum of 15 years in prison.  The court calculated that petitioner was entitled to presentence credit for 535 actual days in custody plus 80 days conduct credits for a total of 615 days.  The court ordered petitioner to pay a restitution fine of $10,000.00 pursuant to Penal Code section 1202.4, subdivision (b), and a parole revocation fine of $10,000.00, pursuant to Penal Code section 1202.45, with the latter being stayed unless parole is revoked.  (CT 200-201.)

On February 8, 2005, petitioner timely filed his notice of appeal from the judgment and sentence.  (Pen. Code, § 1237; CT 214.)

On July 31, 2006, the Court of Appeal, Fourth Appellate District, Division Two, affirmed in whole the judgment and sentence.  (Opinion, p. 18.)

## STATEMENT OF FACTS

On August 9, 2003, a group of friends, Alberto Negrette, Jonathan Bonilla, David Garcia, Ruben Lopez, Robert Zavala and Gustavo Rubio, all decided to go to Lopez' cousin's house for a party. The group, in two different cars, stopped by a Circle K to get an 18-pack of beer. While there, they saw Eddie Sanchez and David Martinez. Apparently, there was animosity between Rubio and Sanchez because both were dating Martinez' sister, Corrina. No confrontation happened however at the Circle K. (I RT 71-74, 80-81, 117-118; II RT 382-383, 443-444.)

Negrette and his group arrived at Lopez' cousin's house around 11:00 p.m. Numerous people were in the backyard, ranging from estimates of 20 to 30 people, to as high as 60 people. Negrette's group went into the backyard and started playing pool. Between them, they split the beer with some people having about four beers, some less. (I RT 75-78, 203, 235-236; II RT 293, 329, 360-361, 421-422.)

Petitioner arrived at the party about an hour after Negrette's group, and spent the time with Sanchez and Martinez, along with others. Rubio knew petitioner from school as did Zavala. Negrette had seen petitioner approximately four months before when he had come to Negrette's house making problems. Bonilla said he "kind of" knew petitioner. Amanda Moya,

6

whose house the party was at, knew petitioner from the neighborhood. All of them stated that petitioner was at the party, although Moya denied it at trial. Garcia and Lopez, who did not know petitioner previously, also testified that petitioner was at the party. (I RT 84-85, 200-201; II RT 296-297, 384, 446; III RT 494-495, 576.)

After being at the party for about two to three hours, Negrette and his group decided to leave. Negrette recalled petitioner's group staring at Negrette and the others, although no one else noticed this. As Rubio was leaving the party, Sanchez came up behind him and slugged him in the mouth. When he did so, Garcia jumped in, put Sanchez in a headlock, and pushed him away from Rubio. Someone said for them to "take it outside" and not cause a commotion in the backyard. (I RT 88-90, 201-203; II RT 363-366, 425-426, 448; III RT 496-499, 556, 576-577.)

Rubio went out to the front with the others, angry about being hit and yelling, although not at anyone in particular. Rubio waited in the street trying to get Sanchez to fight him. Petitioner and a friend walked toward a street corner. About 40 seconds later, petitioner started shooting at Rubio and the others. Lavall Nelson, an officer with the Riverside Department, found 14 shell casings to the right on the intersection. (I RT 90-93, 174-175, 207; II RT 372-375; III RT 503, 560-562.)

7

Garcia and two others went to one car. They were in the car when the first shorts were fired. Garcia saw petitioner holding the gun sideways and moving his arm from left to right. The driver of Garcia's car floored it after the first shot. Garcia's car drove past petitioner, turned the corner, and left the scene. (II RT 366-375, 389-393.)

Negrette, Rubio, Zavala, Bonilla and Lopez all went towards Bonilla's car. When the shooting started, all of them hid behind cars. Rubio saw petitioner shooting randomly at him and his friends. When the shooting stopped, all five of them got into Bonilla's car. Negrette had to be helped into the car because he had been shot in the chest. (I RT 94-95, 99-100, 210; II RT 427-430; III RT 500-502, 559-560.)

Bonilla floored the car straight ahead, away from the shooter, but which led into a dead-end. Bonilla turned the car around in the cul-de-sac, and sped down the street. More shots were fired at the car. At some point, a shopping cart was flung at the car, which knocked off one of Bonilla's mirrors. Bonilla then sped off towards a hospital. Negrette was bleeding in the back seat of the car and the others are trying to staunch it with a shirt. (I RT 100-103, 215-217; II RT 429; III RT 504-505, 560.)

Dr. Jerry Vlasek treated Negrette at Riverside Community Hospital for the gunshot wound to the left side of Negrette's chest and arm. Vlasek

8

performed surgery on Negrette, including removing his spleen and parts of his colon, and closing the hole in his stomach.    Vlasek testified that without surgery Negrette would have died.    Negrette spent a month in the hospital before being released.  He still has numbness in parts of his body and gets tired more easily than he used to before the shooting.  (I RT 221-222; III RT 464-471.)

No one in Negrette's group belonged to a street gang.    However, Negrette's group was aware that petitioner belonged to a gang.    Negrette testified that four months before the shooting, petitioner had come by his house claiming to be a gang member.  (I RT 71-72, 123, 195, 226; II RT 355; III RT 497, 507-508, 553-554.)


## Criminal Street Gang Testimony

Terry Redfearn, an officer with the Riverside Police Department, testified as an expert on criminal street gangs.  (III RT 618.)

Redfearn interviewed petitioner about the shooting.  Although petitioner denied he was involved, and in fact was at his grandparent's house in Lake Elsinore at the time, he did state that he was a member of the Casablanca Evans Street gang.    Petitioner had three Casablanca related tattoos.  (III RT 639-641, 652-653.)

9

Police searched petitioner's room. In it, they found a T-shirt with the picture of a dead gang member, which stated "RIP." The shirt is a sign of respect from one gang member to another. Police also found a letter addressed to petitioner using his gang moniker "Cyco." At various times, petitioner had also been interviewed by police. Officers would then fill out field identification cards with information, including gang affiliation. In both May and August, 2003, petitioner stated that he was a member of Casablanca. (III RT 647-651; IV RT 666-667.)

Although Casablanca does not have specific clothes that its members wear or gang signs, tattoos are important as a way to announce membership in the gang. If a person wears such tattoos, they must stand up for their gang or risk being punished by other gang members. Casablanca is a turf-based gang, claiming a specific area as their own. (IV RT 672-673.)

The primary activity of this gang is manufacturing and selling methamphetamine, firearm assault of rival gang-members, and intimidating witnesses. In one crime, on April 21, 2001, a Casablanca gang member shot a rival gang member in the foot. In another, on July 19, 2002, three Casablanca gang members beat up some people whose car broke down in their neighborhood. The gang-members involved were eventually convicted of a violation of Penal Code section 245, subdivision (a)(1) [assault with deadly

10

weapon and/or intent to cause great bodily injury] and section 186.22, subdivision (b) [witness intimidation with force]. Petitioner also suffered a true finding when he was a juvenile, in October, 2000, that he was involved in manufacturing methamphetamine. Petitioner possessed precursors and a handgun. At the time, he was in Casablanca's area. (IV RT 674-682.)

Redfearn opined that in this case, the crime was committed for the benefit of the criminal street gang. (IV RT 683-686.)


**Defense**

Petitioner's grandmother, Magdalena Robles, and his father, Teodoro Robles, testified that petitioner was home in Lake Elsinore on the night of the shooting. The only person with a car is Teodoro, and he did not give petitioner a ride that night. They also have a fence around the property that is locked at night. Both Magdalena and Teodoro have keys, but no one else does. (IV RT 767-773.)

Teodoro had gone to a party the night of the shooting but returned between 9:30 and 10:00 p.m. He went to sleep soon after. Petitioner was in his bedroom at the time. Magdalena had trouble sleeping and did not go to sleep until 4:00 or 5:00 a.m. Petitioner did not leave that night. (IV RT 780-786.)

11

Matthew Parrish, an officer with the Riverside Police Department, interviewed the various witnesses at the hospital. At the time, the only person who said he was the shooter was Negrette. Everyone seemed reluctant to speak to him however. (IV RT 793-797.)

David Martinez is petitioner's first cousin. Martinez went to the party with Eddie Sanchez. They arrived about one to two hours before Negrette's party. At the time, there were about 80 people in the backyard. (IV RT 825-827.)

Around 1:30, people started leaving. Nothing had been going on between Sanchez and Rubio, although Martinez was aware the two did not like each other. Both had been dating Sanchez' sister. As Sanchez and Rubio were leaving, the two started talking back and forth. Martinez saw Sanchez hit Rubio. When that occurred, people formed around the two, while others jumped in to hold off the two from further fighting. That was the extent of the fight. (IV RT 820, 829-831.)

Martinez stayed in the backyard talking to friends. As he was going around the side yard towards the front, he heard gunshots and went back to the backyard. He waited there until the shots stopped. To him, it sounded like gunshots were going back and forth in the front of the house. When he went in front, the shooting had stopped and people were running to their cars. He did

12

the same and left.  He did not see the shooter.  However, petitioner was not at the party that night.  (IV RT 831-833.)


### Rebuttal

On September 21, 2003, Garcia was playing pool at Lopez' house.  He was there with Arial, Lopez and Zavala.  At some point between midnight and 1:00 a.m., Martinez came to the house along with three other people.  While Martinez leaned on his car, others got into a fight in the street.  Martinez said "who ratted out my cousin?" and asked why they went to the police.  Martinez also said that Rubio should be carrying a gun at all times.  Martinez said all this to Arial, who was not at the party that night.  (IV RT 861-867.)

13

# ARGUMENT

## I.

## INSUFFICIENT EVIDENCE SUPPORTED THE CONVICTION THAT PETITIONER ATTEMPTED TO MURDER GARCIA GIVEN THAT HE WAS ALREADY IN HIS CAR WHEN THE SHOOTING STARTED AND WAS IN A DIFFERENT CAR THAN ALL THE OTHER VICTIMS.

### A.    Introduction.

Petitioner does not dispute the "kill zone" theory of liability in general as set forth in *People v. Bland* (2002) 28 Cal.4[th] 313, 330-331, among others. (Opinion, pp. 8-10.) What petitioner disputes is the application of that theory to this case. There were five people in the street when the shooting started and four of them were named victims. There were three people in a nearby car and one of them was a named victim. (II RT 390-392.) That latter one, Garcia, was inside a car that had momentarily stopped so Garcia could tell others to leave when the shooting started. (II RT 362, 369, 389.) They drove away immediately and left the scene. (II RT 392.) One bullet struck that car. (II RT 396.) More shots were fired after they left. (II RT 393.)

Garcia was the least vulnerable of the people involved. He was in the back seat of a car that left immediately upon the shots being fired. The driver was certainly the closest but was not even a named victim.

14

While there was a kill zone created here, it does not make all those within it necessarily victims of the event. Garcia was not out on the street with the other named victims. This court should accept this case to address the limitations of the "kill zone" theory.

**B.    Reasons For Granting Review.**

A guilty verdict without sufficient evidence violates both the California and Federal Constitution. "A California conviction without adequate support separately and independently offends, and falls under the due process clause of Article I, section 15." (*People v. Rowland* (1992) 4 Cal.4th 238, 269; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [62 L.Ed.2d 560, 99 S.Ct. 2781] (federal due process violation); *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068].)

The issue here is the application of the facts to the "kill zone" theory. The appellate court set out in detail the underlying law in this area. (Opinion, pp. 8-10.)

Garcia testified that he and two others got into Edgar's car. (II RT 367.) They had already started driving and pulled parallel to Bonilla's car before the shooting started. (II RT 368-369.) Garcia was speaking "with [his] window down" (II RT 369), telling his friends to just get in their car and leave the area.

(*Ibid.*)  All the other victims, plus Bonilla, were walking towards Bonilla's car; Garcia conversely was inside the other car.  (*Ibid.*)

When the shots started firing, Edgar floored the car and drove them away.  (II RT 392.)  A bulled hit the windshield, although Garcia was in the back seat.  (*Ibid.*)  None of the other people in the car were named as victim's including Bonilla, the driver of the other car, who was outside when the shooting started.

While it is true that petitioner was shooting towards a group of people on the street, and Garcia's car was nearby, he was the least vulnerable of those in that group.  He was in the backseat of a car with a running motor.  It sped off after the shooting started.

Petitioner seeks this court to review this case concerning the kill-zone theory and its scope in reference to a large group of people, in differing circumstances, and who may or may-not be considered in this group for purposes of liability.  Each count in this case, each victim, carried a 40 year term in prison.  While it makes sense to include some people in the kill-zone, this victim was not one of them.

16

## II.

## INSUFFICIENT EVIDENCE SUPPORTS THE TRUE FINDING THAT PETITIONER COMMITTED THE CRIME FOR THE PURPOSE OF PROMOTING OTHER CRIMINAL ACTIVITIES OF THE CASABLANCA CRIMINAL STREET GANG.

### A.    Introduction.

The jury found true that petitioner had committed the various crimes for the purpose of promoting his criminal street gang, Casablanca, within the meaning of Penal Code section 186.22, subdivision (b).  (CT 174.)  While petitioner agrees both that Casablanca falls within the definition of a criminal street gang and that petitioner is or was a member of that gang, there was insufficient evidence that the crime was to promote any criminal activity of the gang.  None of the victims were gang members, petitioner's friend who did the punching was not a gang member, petitioner did not say anything about his gang, and no threats concerning the gang were made when the crimes occurred.  Even the gang expert testified this had to do with some type of "turf-based" need to control whom people dated.   How that supported some nefarious criminal enterprise is unknown.

Even assuming petitioner was doing this shooting to show that outsiders cannot date "Casablanca woman," (Opinion, p. 16), that has absolutely nothing to do with any criminal enterprise of the gang.  It certainly did not have any benefit for the gang's methamphetamine making enterprise or an armed assault

17

upon rival gang members, nor was it witness intimidation, since the crime was trying to kill them all. (RT 674-675.)

This court should accept this case because there was no connection between petitioner's actions and the criminal enterprise of the gang. It should also decide the applicability of *Garcia v. Carey* (2005) 395 F.3d 1099, or at least its rationale. The Opinion here noted that one published case to discuss it, *People v. Romero* (2006) 140 Cal.App.4th 15, declined to follow it. (Opinion, p. 17, fn. 2.)    The Opinion tried to distinguish it, although unconvincingly. (Opinion, pp. 16-17.)

This court should determine the parameters of the gang-enhancement where, as in this case, the crime itself appears to have no connection to the criminal enterprise of the larger gang.

### B.    Reasons For Granting Review.

This case stretches the gang-enhancement to the very edges of rationality. The issue presented by this case is whether the present criminal activity must promote the gang's criminal enterprise in order for it to qualify as a gang-related crime. This case does not.

18

As the expert testified, the main focus of this gang was selling methamphetamine, assaulting rivals with firearms, and intimidating witnesses. (Opinion, pp. 13-14.) None of those were in play in this case.

The case is about a ridiculous love-triangle. Rubio had been dating Corrina for about a year but Sanchez liked her. (I RT 80-82.) At the time of trial, Corrina was dating Sanchez. (RT 820-821.) As Rubio was leaving the party, Sanchez slugged Rubio. (I RT 88-90.) That was what set off this entire chain of events. When Rubio and the rest of his group got outside, petitioner started shooting in their direction.

So how does this promote the criminal activities of the gang, the second prong of the gang enhancement? Who knows. Rubio and his friends were not involved in the methamphetamine trade and they were not in a rival gang. It therefore does not further those criminal enterprises.

Redfearn believed that the crime benefited the gang in general because Casablanca is a turf-based gang, and a person from Hillside (Rubio) cannot date a person who lives in the Casablanca area (Corrina). (RT 738.) Even assuming that somehow makes sense, with Casablanca acting as a super-chaperone for all the girls in the area, that has nothing to do with the criminal enterprises as set out by Redfearn.

19

The only alleged criminal activity of this gang that makes sense is witness intimidation. But that crime means that there is an ongoing case and the gang is trying to get people not to testify in that case. (Pen. Code, § 136.1, subd. (a).) That is not true because the crime itself is the shooting—it would be circular to argue that the shooting causes the witness intimidation to stop people from testifying in the shooting case. Under that reasoning, every such case would be qualify for a gang enhancement no matter how far attenuated from aiding the gang's criminal enterprise.

Both the court and Redfearn gloss over this fact, arguing instead that it is witness intimidation in the generic meaning of the word. (Opinion, p. 15.) That is, gang members instill fear to large groups, and it occurred in this case because witnesses and victims were fearful of coming forward. (*Ibid.*) But that again is not supporting a criminal enterprise of the gang. There is no link between this case and the crime of manufacturing methamphetamine, for instance. If it is just because people will be scared, that would make every crime in which gang members are involved a "gang" crime.

In *Garcia v. Carey* (2005) 395 F.3d 1099, Garcia was a member of EMF, a criminal street gang. In the early morning hours, Garcia and two companions stopped a person as he came out of a liquor store in the gang's "turf" of El Monte. Garcia took some money from the person's pocket and

20

stole his bicycle. Santos Hernandez, an El Monte Police Detective, testified as an expert on gangs. He testified that the gang was "turf oriented" and that three other robberies, often involving small amounts of money, were one of the gang's primary activities. (*Id.* at pp. 1101-1102.)

The appellate court ultimately upheld the district court's finding that the case lacked any evidence that the robbery was somehow in furtherance of other crimes by the gang. Said the court:

> "But there is no evidence indicating that this robbery was committed with the specific purpose of furthering other gang criminal activity, and there is nothing inherent in the robbery that would indicate that it furthers some other crime. There is nothing on the record that connects the 'turf-oriented' nature of the gang with the commission of robberies generally, or, more importantly, with the commission of this robbery in particular. There is no testimony that protection of turf enables any other kind of criminal activity of the gang. The expert's testimony is singularly silent on what criminal activity of the gang was furthered or intended to be furthered by the robbery of Bojorquez."

(*Id.* at p. 1103.) The court also noted that the specific intent concerning other crimes was never argued to the jury and that no evidence was presented demonstrating how the robbery in Garcia's case furthered other robberies by EMF. (*Id.* at pp. 1103-1104.) As such, it met the standard for granting the petition for habeas relief based upon insufficient evidence.

This case likewise lacks any connection between the shooting and the criminal enterprise of the gang. The appellate court stated that this case is different from *Garcia* because the expert testified that the shooting benefited

21

the gang by intimidating witnesses.  (Opinion, p. 16.)  Back to the same point though argued above, that does not show how it furthered a criminal enterprise of the gang.

The court's argument in a nutshell is that this crime benefited the gang because now people will know that if they disrespect people associated with Casablanca gang members or date girls living in the turf, they will be retaliated against.  (Opinion, p. 16.)  Whatever the merit of that, it simply does not show that the gang's criminal enterprises were furthered in the least by petitioner's actions.  If the main criminal enterprise of Casablanca was dating, maybe the court would have a point.

This court should accept this case and review it.    It should find insufficient evidence under state and federal law.  (*People v. Rowland, supra,* 4 Cal.4[th] at p. 269 [state constitution]; *Jackson v. Virginia, supra,* 443 U.S. at p. 319 [federal due process violation].)

## III.

## IMPOSITION OF AN CONSECUTIVE TERMS VIOLATED PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO A JURY TRIAL AND PROOF BEYOND A REASONABLE DOUBT UNDER THE SIXTH AND FOURTEENTH AMENDMENTS AND *BLAKELY V. WASHINGTON* (2004) 542 U.S. 296 [124 S.CT. 2531, 159 L.ED.2D 403], DESPITE THE CALIFORNIA SUPREME COURT'S DECISION IN *PEOPLE V. BLACK* (2005) 35 CAL.4[TH] 1238.

The court sentenced petitioner to five separate terms for attempted murder, running each of the sentences consecutive to each other. (RT 1007.) The imposition of consecutive terms violates petitioner's rights under the Sixth and Fourteenth Amendments to have all factors that would increase his sentence decided by a jury. (*Blakely v. Washington* (2004) 542 U.S. 296 [124 S.Ct. 2531, 159 L.Ed.2d 403] (hereinafter "*Blakely*").)

Where state law establishes a presumptive sentence for an offense and authorizes a greater term only where there is a finding of certain additional facts (beyond those inherent in the jury verdict or admitted in the guilty plea), any finding as to those additional facts must be determined by a jury on proof beyond a reasonable doubt. (542 U.S. at p. 302.)

The most obvious application of *Blakely* is regarding imposition of the aggravated term. Under California's Determinate Sentencing Law, of the three available terms, "the court shall order imposition of the middle term," unless aggravating or mitigating circumstances are found. (Pen. Code, § 1170, subd.

23

(b); Cal. Rules of Court, rule 4.420(a); *People v. Leung* (1992) 5 Cal.App.4[th]

482, 508.)  The only term of imprisonment that may be imposed based solely

on the jury's verdict is the middle, or presumptive, term.  The term longer than

the presumptive term, the upper term, cannot be imposed without additional

aggravating factors, which are determined solely by the court, based on

unsworn reports and statements by probation officers, prosecutors, victims, and

their families (Pen. Code, § 1170, subd. (b)), all material never presented to or

considered by the jury.  California's judicial fact-finding requires only proof

based on a preponderance of the evidence.  (Cal. Rules of Court, rule 4.420(b);

*People v. Scott* (1994) 9 Cal.4[th] 331, 349.)

Similarly, under California's current sentencing structure, imposition of

consecutive sentences similarly depends upon factors found by the judge, not

the jury.  Concurrent sentencing is the default, because Penal Code section 669

provides that, "[u]pon the failure of the court to determine how the terms of

imprisonment on the second or subsequent judgment shall run, the term of

imprisonment on the second or subsequent judgment shall run concurrently."

Consecutive sentencing is an enhancement and requires a statement of reasons.

(*People v. Powell* (1980) 101 Cal.App.3d 513, 518; Cal. Rules of Court, rule

4.406.)  Rule 4.425 lists three factors to consider and further provides that

"[a]ny circumstance in aggravation or mitigation may be considered in deciding

24

whether to impose consecutive rather than concurrent sentences, except (i) a fact used to impose the upper term, (ii) a fact used to otherwise enhance the defendant's prison sentence, and (iii) a fact that is an element of the crime shall not be used to impose consecutive sentences." (Cal. Rules of Court, rule 4.425(b).) The mere fact of conviction of two or more offenses does not automatically permit imposition of consecutive sentences. Consequently, California's system for imposing consecutive determinate sentences is subject to the same constitutional infirmities as its system for imposing the upper term.

Nonetheless, this court has held that there is no federal constitutional right to a jury trial on fact-finding relating to aggravating factors used to impose an upper term under California's Determinate Sentencing Law or a consecutive sentence. (*People v. Black* (2005) 35 Cal.4th 1238 (*Black*).) Petitioner acknowledges this of course.

However, this acknowledgment is not a concession as to the merits of petitioner's argument, which remains viable. The New Jersey Supreme Court has recently examined its sentencing scheme—a scheme very much like California's—to determine whether it violated the constitutional rights enunciated in *Blakely.* (*New Jersey v. Natale* (August 2, 2005) 184 N.J. 458, 483-484 [imprisonment choice is from a range of years with a statutorily prescribed presumptive term approximately half or three-quarters of the

maximum; court shall impose the presumptive term unless aggravating or mitigating factors weigh in favor of higher or lower term within the statutory range].)  The court held that a sentence above the presumptive statutory term, based solely on a judicial finding of aggravating factors, violates a defendant's jury trial guarantee.  (*Id.* at p. 466.)  The New Jersey Supreme Court even noted that California's sentencing law appeared to be in direct conflict with the federal constitution.  (*Id.* at 473, fn. 4.)  Other state courts have also found jury trial guarantee violations in their sentencing schemes.  (*Lopez v. People* (Colo. 2005) 113 P.3d 713, 728; *State v. Hughes* (2005) 154 Wn.2d 118 [110 P.3d 192] *Smylie v. State* (Ind. 2005) 823 N.E.2d 679, 681-685; *State v. Dilts* (2004) 337 Ore. 645, 654 [103 P.3d 95]; *State v. Shattuck* (Minn. 2004) 689 N.W.2d 785 *(per curiam* order); *State v. Brown* (2004) 209 Ariz. 200, 202-204 [99 P.3d 15]; but see *State v. Gomez* (Tenn. 2005) 163 S.W.3d 632, 658.)

This court should act to correct the constitutional violation in the present case.  Because the error involves the fundamental right to a jury trial, as well as the application of the appropriate burden of proof as to the factual determination, the error is a structural one and requires reversal per se. (*Sullivan v. Louisiana* (1993) 508 U.S. 275 [113 S.Ct. 2078, 124 L.Ed.2d 182] (*Sullivan*); *Arizona v. Fulminante* (1991) 499 U.S. 279 [111 S.Ct. 1246, 113 L.Ed.2d 302].)  Although most constitutional errors are subject to harmless

error review, some errors, such as structural defects in the trial mechanism, would defy such analysis. (*Sullivan, supra,* 508 U.S. at pp. 279, 306-307.) As in the *Sullivan* case, where there was no jury verdict on the fact-finding at issue, here, the factual determination was completely removed from the jury and a lowered burden of proof was used by the court. Because there was no jury fact-finding and thus no finding to review, it is impossible to determine whether the error affected fact-finding. The entire mechanism of fact-finding was erroneous, rather than simply an error in an otherwise correct process overall. (See also *New Jersey v. Natale, supra,* 184 N.J. at pp. 495-496 [reversal for resentencing without consideration of prejudice].)

27

## CONCLUSION

For the reasons set forth hereinabove, this court should accept this petition and review this case.

Dated: September 1, 2006          **TORRES & TORRES**


STEVEN A. TORRES
Attorneys for Defendant and
Petitioner MICHAEL ROBLES

28

## CERTIFICATE OF APPELLATE COUNSEL PURSUANT TO RULE 28.1(e)(1) OF THE CALIFONIA RULES OF COURT

I, Steven A. Torres, appointed counsel for petitioner Michael Ray Robles, hereby certify, pursuant to rule 28.1, subdivision (e)(1) of the California Rules of Court, that I prepared the foregoing petition for review on behalf of my client, and that the word count for this petition is 5,527, which does not include the cover or the tables. This petition therefore complies with the rule, which limits a petition for review to 8,400 words. I certify that I prepared this document in Microsoft Word 2002, and that this is the word count the program generated for this document.

Dated: September 1, 2006          **TORRES & TORRES**

STEVEN A. TORRES
Attorneys for Defendant and
Petitioner Michael Robles

29

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

FILED

JUL 31 2006

COURT OF APPEAL FOURTH DISTRICT

THE PEOPLE,

    Plaintiff and Respondent,

v.

MICHAEL RAY ROBLES,

    Defendant and Appellant.

E037482

(Super.Ct.No. RIF111919)

O P I N I O N

APPEAL from the Superior Court of Riverside County. Edward D. Webster, Judge. Affirmed.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Senior Assistant Attorney General, Meagan J. Beale, Supervising Deputy Attorney General, and Kyle Niki Shaffer, Deputy Attorney General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted defendant of five counts of attempted murder in violation of Penal Code sections 664 and 187, subdivision (a).[1]  The jury also found true an allegation that the attempted murders were committed for the benefit of a criminal street gang under section 186.22, subdivision (b), and allegations that defendant personally fired a handgun causing great bodily injury within the meaning of section 12022.53, subdivision (d).  The court sentenced defendant to a total indeterminate term of 200 years to life.  The court further ordered that defendant serve a minimum of 15 years before being considered for parole.  (§ 186.22, subd. (b)(5).)

Defendant contends that:  (1) there is insufficient evidence to support the conviction for the attempted murder of David Garcia (count 5); (2) there is insufficient evidence to support the true findings on the gang enhancement; and (3) the imposition of consecutive sentences violates his constitutional rights under *Blakely v. Washington* (2004) 542 U.S. 296 [124 S.Ct. 2531, 159 L.Ed.2d 403].  We disagree, and affirm.

STATEMENT OF FACTS

A.  *Events of August 9, 2003*

On August 9, 2003, a group of friends, Gustavo Rubio, David Garcia, Alberto Negrete, Ruben Lopez, Jonathan Bonilla, Robert Zavala, Edgar Velasquez, and Manuel Vasquez decided to go to the house of Lopez's cousin, Amanda Moya, for a party.  For ease of reference, we will refer to these individuals as "Rubio's group."  Rubio's group

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

took two cars over to Moya's. Lopez, Negrete, Rubio, Zavala, and Bonilla were in Bonilla's car. Garcia, Vasquez, and Velasquez were in Velasquez's car.

Before arriving at Moya's house, the two cars stopped at a Circle K store to get an 18-pack of beer. While there, the group saw Eddie Sanchez and David Martinez. Sanchez is a friend of defendant. There was preexisting animosity between Rubio and Sanchez because they were both dating Corrina Martinez. Corrina is Martinez's sister and defendant's cousin.

Rubio's group arrived at Moya's house around 11:00 p.m. Moya's house is located on the west side of Blossom Way, a cul-de-sac that opens up to Harley Street on the south end. Bonilla parked his car on the same side of the street as Moya's house, near the open end of the cul-de-sac, facing Harley. Velasquez parked his car on the other side of the street, facing the closed end of the cul-de-sac. His car was parked closer to the end of the cul-de-sac than to the intersection.

Rubio's group, including Garcia, went straight to the pool table in Moya's backyard. Defendant was seen in Moya's backyard socializing with Martinez and Sanchez. There was no interaction between these two groups. After staying for about two to three hours, Rubio's group, including Garcia and Rubio, decided to leave. As they were leaving, Sanchez approached Rubio from Rubio's side and struck him in the face with his fist. Garcia immediately ran up and put Sanchez in a headlock to maneuver Sanchez away from Rubio and stop the fight.

3

Rubio was upset and continued out to the middle of the street where he shouted at

Sanchez to fight.  Defendant and a friend walked by Rubio's group to the street corner.

Garcia, Velasquez, and Vasquez got in Velasquez's car; Garcia was in the

backseat of the car.  Velasquez turned the car around and drove up next to Bonilla's car.

Garcia was telling everyone in the middle of the street to get into Bonilla's car and leave.

Then, gunshots were heard coming from the defendant's location, which was about 30 to

60 feet away, or about two to three houses down.

Defendant was seen holding his gun sideways, moving his arm from right to left as

he fired towards the two cars from the intersection of Blossom and Harley.  Defendant

was shooting randomly, in rapid succession, towards the two cars in the street.  When one

of the first shots hit Velasquez's car, Velasquez quickly accelerated away from the scene.

Negrete, who was standing near both cars and Rubio, was injured by a bullet in his chest

and arm.  When there was a pause in the spraying of bullets, Bonilla's passengers got into

his car and left the scene.

Riverside Police Officer Lavall Nelson found 14 shell casings within 20 to 25 feet

of each other near the intersection of Blossom and Harley.  Nelson said that the casings

were all fired from the same semiautomatic gun.  This finding was also confirmed by

James Hall, a senior criminalist with the State of California, Department of Justice,

Riverside Crime Laboratory.

B. *Evidence Relevant to Gang Enhancement*

The prosecution presented evidence relevant to the gang enhancement allegations

primarily through the testimony of a gang expert, Riverside Police Detective Terry

4

Redfearn. Defendant was a member of the Casablanca Evans Street gang. According to Redfearn, Casablanca is a turf-based gang and has the reputation of being one of the most violent gangs in Riverside. Moya's residence is located about a mile away from Casablanca's territory. Neither Rubio nor any of his friends were gang members. However, they knew that defendant was a member of the Casablanca gang.

The primary activities of the Casablanca gang are manufacturing and selling methamphetamine, assaulting rivals with firearms, and intimidating witnesses. Redfearn was presented with a hypothetical that paralleled the facts in this case. The detective opined that the attempted murders were committed in association with and for the benefit of the defendant's gang. He noted that the crimes were committed in close proximity to Casablanca's turf, and the victims knew defendant was a Casablanca gang member. Rubio was dating defendant's cousin Corrina, who lived in the Casablanca gang's territory.

Redfearn also explained that gang members and their associates boast about the crimes they commit in order to let the community know of their crimes, thereby instilling fear in potential witnesses. Community fear of the gang is also fostered when, as here, a shooting takes place in public where the gang member can be identified. By instilling such fear, the gang member hopes to avoid prosecution because witnesses are too afraid to testify. The community's fear of the defendant and his fellow gang members manifested itself in this case, because some victims and witnesses were reluctant to get involved, or to testify against defendant.

On cross-examination, Redfearn stated it was possible that the shooting was random or occurred because of a love triangle involving Rubio, Sanchez, and Corrina. However, he testified that this explanation was "not very probable."

C. *Defense*

Defendant's grandmother, Magdalena Robles, and his father, Teodoro Robles, testified that defendant was home in Lake Elsinore on the night of the shooting. The only person in the family with a car is Teodoro, and he did not give defendant a ride that night. They also have a fence around the property that is locked at night, and only Magdalena and Teodoro have keys.

Teodoro had gone to a party the night of the shooting but had returned between 9:30 and 10:00 p.m. He went to sleep soon afterward. Defendant was in his bedroom at this time. Magdalena had trouble sleeping and did not go to sleep until 4:00 or 5:00 a.m. She said that defendant did not leave that night.

D. *Rebuttal*

On September 21, 2003, about six weeks after the shooting, Garcia was playing pool at Lopez's house. Martinez, defendant's cousin, came to the house and got in a fight with others. Martinez asked, "'Who ratted out my cousin?'" Then he asked, "'Why did you go to the cops?'" Martinez also said that Rubio should be carrying a gun at all times.

DISCUSSION

A. *There is Sufficient Evidence to Support the Conviction on Count 5 Based Upon Garcia's Location Within Defendant's "Kill Zone"*

    1. Standard of Review

      In determining whether the prosecution has submitted sufficient evidence to support a conviction, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319 [99 S.Ct. 2781, 61 L.Ed.2d 560]; *People v. Pre* (2004) 117 Cal.App.4th 413, 421.)

      The appellate court in a criminal case does not determine whether the defendant is guilty beyond a reasonable doubt and so must not reweigh or resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) Further, "[t]he uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296; see also *People v. Allen* (1985) 165 Cal.App.3d 616, 623.) Lastly, reversal on this ground is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." (*People v. Redmond* (1969) 71 Cal.2d 745, 755; see also *People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765.)

7

2. <u>Relevant Law</u>

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citation.]" (*People v. Smith* (2005) 37 Cal.4th 733, 751 (*Smith*), quoting *People v. Lee* (2003) 31 Cal.4th 613, 623.) The defendant's state of mind must be evaluated as to each alleged victim to determine whether he had the intent to kill that particular person. (*People v. Bland* (2002) 28 Cal.4th 313, 328 (*Bland*).) Intent to kill requires more than knowledge that a victim's life is in danger. (*Smith, supra* at p. 751.) ""For a result to be caused 'intentionally,' the actor must either desire the result or know, to a substantial certainty, that the result will occur." [Citation.]"" (*People v. Davenport* (1985) 41 Cal.3d 247, 262.)

*Bland, supra,* 28 Cal.4th 313, involved facts similar to those presented here in which the defendant created a "kill zone." (*Id.* at p. 333.) In *Bland,* the defendant approached a car carrying a driver and two passengers. (*Id.* at p. 318.) The defendant identified the driver and conversed with him. Defendant did not know anything about the two passengers, other than the fact that they were not gang members. When the driver began to drive away, the defendant shot into the car with a .38-caliber handgun. The driver died from a gunshot wound to the chest; the two passengers survived their bullet wounds. Defendant was convicted of murder of the driver and attempted murder of the two passengers. (*Ibid.*)

8

The *Bland* court explained that the theory of concurrent intent permits a defendant "who shoots at a group of people to be punished for the actions towards everyone in the group even if that person primarily targeted only one of them." (*Bland, supra,* 28 Cal.4th at p. 329.) The court adopted the rationale of a Maryland Court of Appeals case, *Ford v. State* (1993) 625 A.2d 984, 1000-1001 (*Ford*), which applied the theory of concurrent intent to circumstances where the defendant creates a "kill zone." (*Bland, supra,* at p. 329.) "'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. . . . Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably

9

infer that the defendant intended that harm to all who are in the anticipated zone.'" (*Id.* at

pp. 329-330, quoting *Ford, supra,* 625 A.2d at pp. 1000-1001; see also *Smith, supra,* 37

Cal.4th at pp. 745-746.)

The *Bland* court also relied upon *People v. Vang* (2001) 87 Cal.App.4th 554

(*Vang*). In *Vang,* the defendants drove by two residences spraying bullets into them with

the primary purpose to kill only one person in each residence; they were convicted of 11

counts of attempted murder of people inside the residences. (*Id.* at pp. 556-558.) The

defendants argued that the evidence was insufficient to prove that they intended to kill

anyone other than two specific individuals within the residences. (*Id.* at p. 563.) The

Court of Appeal rejected the argument, and held that the jury reasonably inferred from

the "placement of the shots, the number of shots, and the use of high-powered, wall-

piercing weapons, that defendants harbored a specific intent to kill every living being

within the residences they shot up. . . . The fact they could not see all of their victims did

not somehow negate their express malice or intent to kill as to those victims who were

present and in harm's way, but fortuitously were not killed." (*Id. at* pp. 563-564.)

Under *Bland* and *Vang,* a rational jury may, on a theory of concurrent intent,

convict a defendant of attempted murder as to each person within a "kill zone" created by

the defendant, even if the defendant cannot see all of his or her victims.

3. Application of Legal Principles to Our Facts

Defendant contends that the evidence was insufficient to support his conviction on

the attempted murder of Garcia (count 5). He argues that, at the time the shots were

fired, Garcia was not within the "kill zone" because Garcia was already in his car when

10

the shooting started, and because he was in a different car than the other victims. We disagree.

There is sufficient evidence from which the jury could reasonably conclude that Garcia was within the kill zone. Garcia testified that he, Velasquez, and Vasquez got into Velasquez's car, turned around at the cul-de-sac, and pulled up next to Bonilla's car before the shooting started. Garcia was sitting in the backseat of Velasquez's car. With the car window rolled down, Garcia was telling his friends in the street to get in their car and leave the area. Negrete, Bonilla, Zavala, Rubio, and Lopez were standing in the street near the two cars, or getting into Bonilla's car as the shooting began. Negrete and Bonilla were standing near the rear passenger side of Velasquez's car, close to Garcia. One bullet hit the windshield of Velasquez's car and another hit Negrete in the chest and in the arm. The evidence thus shows that both Negrete's and Velasquez's cars were within defendant's kill zone. Because Garcia was in Velasquez's car at the time and Negrete was standing close to him, the jury could reasonably conclude that Garcia was also within the kill zone.

Defendant's mode of attack also supports the inference of a kill zone encompassing a wide area around and including the two cars. Defendant was between 30 and 60 feet away and seen holding his gun sideways, moving his arm from right to left as he fired towards the two cars and the group of people in the street. The range of movement of defendant's arm from right to left defined the boundary of the kill zone. As in *Vang*, the placement of shots, the number of shots, and the type of weapon used can support an inference of an intent to kill all the victims within the kill zone. Here,

11

defendant fired 14 shots from a semiautomatic gun, shooting randomly, in rapid

succession, and with no significant pauses in the direction of the two cars and the group

of people in the street. This conduct is similar to the example of a kill zone created by

shooting at the group of "A, B, and C" described in *Ford* and *Bland*. From the manner of

defendant's attack on the group, the jury could reasonably conclude that defendant

created a kill zone that included the area around the two cars with the concurrent intent to

kill all persons in the zone.

Defendant argues that Garcia was not in the kill zone because Velasquez's car left

the scene once shots were fired. We reject this argument. There is ample evidence that

the car was within the kill zone when the initial shots were fired. The fact that Velasquez

sped away when his car was shot at has no bearing upon the question of whether the car

was within the kill zone when the shooting began.

B. *Substantial Evidence Supports the Gang Enhancement*

Defendant contends that the evidence that defendant's actions were committed for

the benefit of, at the direction of, or in association with the Casablanca gang was

insufficient to support the true findings on the gang enhancement allegation.

1. Standard of Review

The substantial evidence standard applies to our review of true findings under the

section 186.22 gang enhancement statute. (*People v. Vy* (2004) 122 Cal.App.4th 1209,

1221; *People v. Ortiz* (1997) 57 Cal.App.4th 480, 484; *People v. Augborne* (2002) 104

Cal.App.4th 362, 371.) The question on appeal is whether any rational trier of fact could

have found the elements of the gang enhancement allegation true beyond a reasonable

12

doubt. Since it is the exclusive province of the jury to determine credibility of witnesses and the truth or falsity of the facts, conflicts in the evidence or testimony subject to justifiable suspicion do not warrant reversal. (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

### 2. Relevant Law

Section 186.22, subdivision (b)(1) requires that the felony for which the defendant stands convicted (attempted murder in this case), must have been committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."

It is well settled that expert testimony about gang culture and habits is evidence that a jury may rely on to reach a true finding on a gang enhancement allegation. (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930, citing *People v. Valdez* (1997) 58 Cal.App.4th 494, 506.) "[T]he culture and habits of criminal street gangs are a proper subject for expert testimony . . . ." (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 654.) Gang experts may express opinions based on the evidence presented in the case, on whether or not the act was committed for the benefit of, at the direction of, or in association with a criminal street gang. The expert may also provide the jury with the reasoning behind the opinion. (*People v. Gardeley* (1996) 14 Cal.4th 605, 618.)

### 3. Application

Redfearn, an expert on criminal street gangs and specifically the Casablanca gang, explained that Casablanca is a turf-based gang and has the reputation of being one of the most violent gangs in Riverside. The primary activities of the Casablanca gang are

manufacturing and selling methamphetamine, assaulting rivals with firearms, and intimidating witnesses. Defendant had announced his affiliation with this gang not only at Negrete's house several months prior to the incident, but also to Redfearn.

Redfearn testified that tattoos are an important way to announce membership in a gang. He stated that a tattoo is the highest form of commitment to a gang because it is there for everyone to see where your loyalty lies. Redfearn explained that if a person wears such tattoos, they must stand up for their gang or risk being punished by other gang members. Defendant has tattoos located on his left inner arm, across his chest, and on his shins.

When Redfearn was presented with a hypothetical that paralleled the facts in this case, he opined that the attempted murders were committed for the benefit of the defendant's gang. He noted that the crimes were committed in close proximity to Casablanca's turf (Moya's residence is located about a mile away from Casablanca's territory), and the victims knew defendant was a Casablanca gang member. Also, Rubio was dating defendant's cousin Corrina, who lived in Casablanca's territory. Redfearn explained that the Casablanca gang members are very territorial and do not like outsiders to date girls who live within their turf.

Redfearn stated that, "if you mess with somebody from Casablanca, that you will immediately suffer for it." Also, by crossing a gang member's friend, the person is crossing the gang member by association. The gang member's retaliation on the person who crossed his or her friend, Redfearn explained, would benefit the gang by

14

intimidating people in the community from crossing gang members or their friends in the future.

Redfearn also stated that since defendant "hit somebody from the group that . . . he meant to hit, then he would be respected by the gang because he did this act and he retaliated for Casablanca and that somebody from a rival area was hit." Redfearn explained that gang members associate "respect" with "fear." He further explained how defendant's actions created fear among the residents, so that they would not report defendant to the police, thus creating witness intimidation. The community's fear of the defendant and his fellow gang members manifested itself in this case. As Redfearn testified: "[W]hat I experienced in this investigation is that there was an unwillingness on the part of the victims and witnesses to come forward and tell me what happened and then ultimately testify. It took quite a while for me to talk them [into] telling me what they knew."

Redfearn explained that because the shooting occurred in a place where defendant can be identified, the shooting can instill fear in a large group. The gang member's only hope of not being prosecuted was for victims to be too afraid to testify. Redfearn discussed how this allows the gang to remain active even though the community knows its members' names and knows them on sight, because people are not going to testify against them due to their fear.

Defendant argues that there was no witness intimidation because there was no ongoing case, so no witness could be prevented from giving testimony. He argues that the shooting was not an attempt to prevent people from reporting the victimization to

15

police because the shooting was the crime itself, thereby making every attempted murder a witness intimidation case regardless of motive. He contends that the shooting was done solely for the purpose of taking the side of his friend who was involved in a love triangle. Defendant further argues that even if defendant's actions were to show that outsiders cannot date "Casablanca women," his actions had nothing to do with any criminal activities of the gang. It did not benefit the gang's methamphetamine-making enterprise, did not deal with armed assault upon rival gang members, and was not witness intimidation.

While these are all arguments that could be made to a jury, there is nonetheless substantial evidence to support the jury's finding that defendant's conduct benefited the Casablanca gang. This court does not reweigh the evidence or redetermine issues of credibility. (*People v. Ochoa, supra,* 6 Cal.4th at p. 1206.) Based upon the facts and Redfearn's testimony, the jury could reasonably conclude that defendant's conduct demonstrated to others that if they disrespect individuals associated with Casablanca gang members, or date girls living within their turf, that they will be retaliated against. The jury could also have reasonably concluded that the open and brazen manner of defendant's shooting benefited the gang by creating fear of the gang in the community.

Defendant relies heavily on *Garcia v. Carey* (9th Cir. 2005) 395 F.3d 1099 (*Garcia*). In *Garcia*, the Ninth Circuit held that the evidence in that case was insufficient to support the jury's finding that the petitioner committed a robbery with the specific intent to facilitate criminal conduct by his gang. (*Id.* at p. 1103.) The *Garcia* court stated: "[T]here is no evidence indicating that this robbery was committed with the

16

specific purpose of furthering other gang criminal activity, and there is nothing inherent in the robbery that would indicate that it furthers some other crime. There is nothing on the record that connects the 'turf-oriented' nature of the gang with the commission of robberies generally, or, more importantly, with the commission of this robbery in particular. There is no testimony that protection of turf enables any other kind of criminal activity of the gang. The expert's testimony is singularly silent on what criminal activity of the gang was furthered or intended to be furthered by the robbery . . . ." (*Ibid.*) *Garcia* is distinguishable. Unlike in *Garcia,* the gang expert in this case, Redfearn, explained specifically how defendant's criminal activity furthered and benefited the Casablanca gang by intimidating witnesses. Thus, the type of evidence missing in *Garcia* was presented in this case. That case is not controlling here.[2]

C. *Constitutionality of Court's Imposition of Upper Term*

Defendant contends that the trial court's imposition of consecutive sentences violates his federal constitutional rights under *Blakely v. Washington, supra,* 542 U.S. 296. He acknowledges that his argument is contrary to the California Supreme Court's decision in *People v. Black* (2005) 35 Cal.4th 1238, which held that "a jury trial is not required on the aggravating factors that justify imposition of consecutive sentences." (*Id.*

---

[2] The only published California Court of Appeal decision to discuss *Garcia* has declined to follow it. (See *People v. Romero* (2006) 140 Cal.App.4th 15.)

at p. 1262.)  We are bound to follow *Black*.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455-456.)[3]  Accordingly, we reject defendant's argument.

DISPOSITION

      The judgment is affirmed.

      NOT TO BE PUBLISHED IN OFFICIAL REPORTS

/s/ King _____
J.

We concur:

/s/ Richli _____
          Acting P.J.

/s/ Gaut _____
          J.

---

   [3] The United States Supreme Court has granted certiorari in *People v. Cunningham* (2005) [nonpub. opn.], certiorari granted *sub nom. Cunningham v. California* (2006) ___ U.S. ___ [126 S.Ct. 1329, 164 L.Ed.2d 47], on the issue of whether *Blakely* applies to California's determinate sentencing law.

18

## PROOF OF SERVICE

STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

I, Steven A. Torres, am employed in Los Angeles, CA; I am over the age of 18 years and not a party to the within action; my business address is PMB 332, 3579 East Foothill Boulevard, Pasadena, California 91107.

On September 2, 2006, I served the foregoing **Petition For Review** by mail upon the following interested parties in this action:

Office of the Attorney General
P.O. Box 85266
San Diego, California 92186-5266

Stuart V. Sachs
Deputy Public Defender
4200 Main Street
Riverside, CA 92501

Appellate Defenders, Inc.
555 West Beech Street
Suite 300
San Diego, California 92101

Miquel Valdovinos
Deputy District Attorney
4075 Main Street
Riverside, CA 92501

Michael Ray Robles

Court of Appeal
Fourth Appellate District, Div. 2
3389 Twelfth Street
Riverside, CA 92501

Hon. Edward Webster
Riverside Superior Court
4100 Main Street
Riverside, CA 92501

I declare on this 2nd day of September, 2006 under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

_____
STEVEN A. TORRES

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**FILED**

OCT 29 2007

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**I (a) PLAINTIFFS**

Michael Ray Robles

2254    1983

FILING FEE PAID

Yes    No

IFP MOTION FILED

Yes    No

COPIES SENT TO

Court    Prose

**DEFENDANTS**

Derral G. Adams, Warden

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**  Kings
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Michael Ray Robles
PO Box 5246
Corcoran, CA 93212
V-69864

**ATTORNEYS (IF KNOWN)**

'07 CV 2069    JAH PCL

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**
(For Diversity Cases Only)

|  | PT | DEF |  | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

## 28 U.S.C. 2254

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 RR & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☒ 530 General | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ Security Act | | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 950 Constitutionality of State |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding   ☐ 2 Removal from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.r.c.p. 23   DEMAND $   Check YES only if demanded in complaint:   JURY DEMAND: ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**   JUDGE   Docket Number

DATE   10/29/2007

SIGNATURE OF ATTORNEY OF RECORD
R. Melli